PUBLIC VERSION

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**STEUBEN FOODS, INC.,**

Case No. 1:13-cv-00892-EAW-JJM

*Plaintiff,*

**Defendant's Answer, Amended**
**Affirmative Defenses, Amended**
**Counterclaims, and Jury Demand**

v.

**NESTLÉ USA, INC.,**

*Defendant.*

---

### DEFENDANT'S ANSWER, AMENDED AFFIRMATIVE DEFENSES, AMENDED COUNTERCLAIMS, AND JURY DEMAND

Defendant Nestlé USA, Inc. ("NUSA") by and through its undersigned counsel, answers

the Complaint of Plaintiff Steuben Foods, Inc. ("Steuben" or "Plaintiff"), as follows:

1.      NUSA admits that the Complaint purports to be an action for patent infringement

under Title 35 of the United States Code, but denies that it has committed any act of infringement.

### PARTIES

2.      NUSA is without knowledge or information sufficient to form a belief as to the truth

of the allegations of paragraph 2 and, thus, denies them.

3.      NUSA admits that it is a Delaware corporation, that it is registered to do business in

the State of New York, and that it has a principal place of business at 800 North Brand Boulevard,

Glendale, California 91203.

### JURISDICTION AND VENUE

4.      Paragraph 4 states a legal conclusion to which no response is required. To the extent a

response is required, NUSA admits that this Court has jurisdiction over the subject matter of this

action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      Paragraph 5 states a legal conclusion to which no response is required.  NUSA admits that is does business in New York. NUSA denies the remaining allegations of paragraph 5.

6.      Paragraph 6 states a legal conclusion to which no response is required. To the extent a response is required, denied.

7.      Paragraph 7 states a legal conclusion to which no response is required. To the extent a response is required, denied.

8.      Paragraph 8 states a legal conclusion to which no response is required.  To the extent a response is required, denied.

## FACTUAL BACKGROUND

9.      NUSA admits that a copy of U.S. Patent No. 6,945,013 ("the '013 Patent") is attached to Plaintiff's Complaint as Exhibit A. NUSA denies the remaining allegations of paragraph 9.

10.     Denied.

11.     NUSA admits that a copy of U.S. Patent No. 6,536,188 ("the '188 Patent") is attached to Plaintiff's Complaint as Exhibit B. NUSA denies the remaining allegations of paragraph 11.

12.     Denied.

13.     NUSA admits that a copy of U.S. Patent No. 6,481,468 ("the '468 Patent") is attached to Plaintiff's Complaint as Exhibit C. NUSA denies the remaining allegations of paragraph 13.

14.     Denied.

15.     NUSA admits that a copy of U.S. Patent No. 6,475,435 ("the '435 Patent") is attached to Plaintiff's Complaint as Exhibit D. NUSA denies the remaining allegations of paragraph 15.

16.     Denied. Regarding the footnote to paragraph 16, NUSA admits that the '435 Patent is undergoing reexamination, but otherwise denies the allegations of the footnote to paragraph 16.

17.     NUSA admits that a copy of U.S. Patent No. 6,209,591 ("the '591 Patent") is attached to Plaintiff's Complaint as Exhibit E. NUSA denies the remaining allegations of paragraph 17.

PUBLIC VERSION

18.     Denied.

19.     NUSA admits that paragraph 19 of Plaintiff's Complaint refers to the '013 Patent, the '188 Patent, the '468 Patent, the '435 Patent, and the '591 Patent collectively as the "Patents in Suit." NUSA denies the remaining allegations of paragraph 19.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

24.     NUSA admits that a letter dated October 4, 2012, purportedly from Brian G. Manka of Steuben Foods, was addressed to Andy Murray, of NUSA, and attached a copy of a complaint alleging patent infringement by GEA Procomac S.p.A. NUSA denies the remaining allegations of paragraph 24.

25.     NUSA is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 25 and, thus, denies them.

26.     Denied.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 6,945,013)

27.     NUSA repeats and incorporates by reference paragraphs 1 through 26 as if fully set forth herein.

28.     Denied.

29.     Denied.

30.     Denied.

31.     Denied.

PUBLIC VERSION

32.     Denied.

33.     Denied.

## SECOND CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 6,536,188)

34.     NUSA repeats and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

## THIRD CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 6,481,468)

41.     NUSA repeats and incorporates by reference paragraphs 1 through 40 as if fully set forth herein.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

PUBLIC VERSION

**FOURTH CAUSE OF ACTION**
**(INFRINGEMENT OF U.S. PATENT NO. 6,475,435)**

48.     NUSA repeats and incorporates by reference paragraphs 1 through 47 as if fully set forth herein.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

**FIFTH CAUSE OF ACTION**
**(INFRINGEMENT OF U.S. PATENT NO. 6,209,591)**

55.     NUSA repeats and incorporates by reference paragraphs 1 through 54 as if fully set forth herein.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

**RESPONSE TO REQUEST FOR RELIEF**

62.     NUSA denies that it infringes or has infringed any valid and enforceable claim of the Patents in Suit. NUSA denies all remaining allegations not specifically admitted herein. NUSA denies that Plaintiff is entitled to judgment or any of the relief set forth in its "REQUEST FOR RELIEF," including specifically subparagraphs 1-14.

PUBLIC VERSION

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE
### (Invalidity of U.S. Patent No. 6,945,013)

63.     One or more claims of the '013 Patent are invalid for failure to comply with the conditions and requirements of patentability set forth in the United States Patent Laws Title 35 of the United States Code, including specifically and without limitation §§ 102, 103, 112, and the rules, regulations, and/or laws pertaining thereto.

### SECOND DEFENSE
### (Invalidity of U.S. Patent No. 6,536,188)

64.     One or more claims of the '188 Patent are invalid for failure to comply with the conditions and requirements of patentability set forth in the United States Patent Laws Title 35 of the United States Code, including specifically and without limitation §§ 102, 103, 112, and the rules, regulations, and/or laws pertaining thereto.

### THIRD DEFENSE
### (Invalidity of U.S. Patent No. 6,481,468)

65.     One or more claims of the '468 Patent are invalid for failure to comply with the conditions and requirements of patentability set forth in the United States Patent Laws Title 35 of the United States Code, including specifically and without limitation §§ 102, 103, 112, and the rules, regulations, and/or laws pertaining thereto.

### FOURTH DEFENSE
### (Invalidity of U.S. Patent No. 6,475,435)

66.     One or more claims of the '435 Patent are invalid for failure to comply with the conditions and requirements of patentability set forth in the United States Patent Laws Title 35 of the United States Code, including specifically and without limitation §§ 102, 103, 112, and the rules, regulations, and/or laws pertaining thereto.

PUBLIC VERSION

**FIFTH DEFENSE**
**(Invalidity of U.S. Patent No. 6,209,591)**

67.     One or more claims of the '591 Patent are invalid for failure to comply with the

conditions and requirements of patentability set forth in the United States Patent Laws Title 35 of the

United States Code, including specifically and without limitation §§ 102, 103, 112, and the rules,

regulations, and/or laws pertaining thereto.

**SIXTH DEFENSE**
**(Prosecution History Estoppel)**

68.     Plaintiff is estopped from asserting that any valid and enforceable claim of each of the

'013 Patent, the '188 Patent, the '468 Patent, the '435 Patent, and the '591 Patent is infringed by

NUSA, either literally or by application of the doctrine of equivalents, because of admissions,

amendments, arguments, and statements to the Patent Office during prosecution of the applications

leading to, or relating to, the issuance of each of the '013 Patent, the '188 Patent, the '468 Patent, the

'435 Patent, and the '591 Patent.

**SEVENTH DEFENSE**
**(Laches)**

69.     Plaintiff's purported claims for infringement are barred, in whole or in part, to the

extent that they allege acts of infringement barred by the doctrine of laches including its delay in

filing a suit.

**EIGHTH DEFENSE**
**(Equitable Estoppel or Unclean Hands)**

70.     Plaintiff's purported claims for infringement of each of the '013 Patent, the

'188 Patent, the '468 Patent, the '435 Patent, and the '591 Patent are barred by the doctrine of

equitable estoppel or unclean hands.

PUBLIC VERSION

## NINTH DEFENSE
### (No Entitlement to an Injunction)

71.     Plaintiff is not entitled to injunctive relief in this action because *inter alia*: (1) NUSA has not infringed and is not infringing any claim of the '013 Patent, the '188 Patent, the '468 Patent, the '435 Patent, or the '591 Patent; (2) each of the '013 Patent, the '188 Patent, the '468 Patent, the '435 Patent, and the '591 Patent is invalid; (3) any purported injury to Plaintiff is neither immediate nor irreparable; (4) even if Plaintiff had suffered some injury (which it has not), there is an adequate remedy at law and monetary damages would be sufficient; (5) the public interest strongly disfavors an injunction under the circumstances; and (6) the balance of the hardships favors NUSA.

## TENTH DEFENSE
### (Unenforceability)

72.     At least one claim of the '013 Patent, as asserted by Plaintiff is unenforceable because the claims asserted in the Complaint have been relinquished in reexamination by the Plaintiff and/or rejected by the USPTO.

73.     At least one claim of the '188 Patent, as asserted by Plaintiff is unenforceable because the claims asserted in the Complaint have either been cancelled or amended by Plaintiff.

74.     At least one claim of the '468 Patent, as asserted by Plaintiff is unenforceable because the claims asserted in the Complaint have either been cancelled or amended by Plaintiff.

75.     At least one claim of the '591 Patent, as asserted by Plaintiff is unenforceable because the claims asserted in the Complaint have either been cancelled or amended by Plaintiff.

## ELEVENTH DEFENSE
### (Intervening Rights)

76.     NUSA has intervening rights in all claims of the '013 Patent, the '188 Patent, the '468 Patent, the '435 Patent, and the '591 Patent that were added or amended during based on reexamination.

8

PUBLIC VERSION

## TWELFTH DEFENSE
### (Misuse)

77.    Plaintiff has attempted to assert claims of one or more of the '013 Patent, the

'188 Patent, the '468 Patent, the '435 Patent, and the '591 Patent in its Complaint.

78.    Plaintiff's Complaint was filed September 3, 2013. The only claims identified in the

exhibits to the Complaint are the original claims of each of the '013 Patent, the '188 Patent, the

'468 Patent, the '435 Patent, and the '591 Patent.

79.    Claims 1 and 4-20 of the '013 Patent were determined to be reasonably likely

unpatentable in an institution decision in IPR2014-00041.

80.    Plaintiff filed a motion to amend claims 10, 18, and 19 of the '013 Patent in IPR2014-

00041. The amendments were material to the claims. Plaintiff thereby tacitly acknowledged the

invalidity of those claims.

81.    Claims 18-20 of the '013 Patent were determined to be reasonably likely unpatentable

in an institution decision in IPR2014-01235.

82.    Plaintiff canceled claims 1-8, 10-15, 17, 18, and 20 and materially amended claim 16

of the '188 Patent during reexamination. These claims were cancelled or amended before the filing of

Plaintiff's Complaint.

83.    Claim 40 of the '188 Patent was determined to be reasonably likely unpatentable in an

institution decision in IPR2014-00055.

84.    Plaintiff amended claims 1, 11, 12, 23, and 35 of the '468 Patent during reexamination

proceedings.

85.    Claims 1-27 and 32-35 of the '468 Patent were determined to be reasonably likely

unpatentable in an institution decision in IPR2014-00054.

PUBLIC VERSION

86.    Claims 1-37 of the '435 Patent were determined to be reasonably likely unpatentable in an institution decision in IPR2014-00043.

87.    Plaintiff materially amended claims 1, 3, 16, 22, 24, and 26 of the '591 Patent during reexamination. Claims 1, 3, 16, 22, 24, and 26 are the only independent claims of the '591 Patent prior to reexamination. Amendments to the independent claims also amend all dependent claims.

88.    The amendments to claims 1, 3, 16, 22, 24, and 26 of the '591 Patent were filed within one week of Plaintiff filing its Complaint against NUSA. On information and belief, Plaintiff knew prior to filing its Complaint against NUSA that it would amend these claims.

89.    Plaintiff's assertion of original claims that have been cancelled or amended creates an anticompetitive effect. The threat of litigation has a chilling effect on the market for bottle filling machines and aseptic bottling generally, thereby inhibiting NUSA's ability to obtain processing machines and/or secure contracts with others to provide aseptically bottled products, which it is legally allowed to obtain and/or to practice methods which it is legally allowed to practice. Plaintiff has asserted and continues to assert claims that Plaintiff has no objective basis to believe are valid, infringed, and not subject to NUSA's intervening rights.

90.    Plaintiff's assertions also impermissibly broaden the scope of one or more of the '013 Patent, the '188 Patent, the '468 Patent, the '435 Patent, and the '591 Patent, and attempt to unlawfully restrain trade by asserting claims that are not enforceable because they have been canceled or amended.

### THIRTEENTH DEFENSE
### (Unenforceability Due to Inequitable Conduct)

91.    Each of the '013 patent, '188 patent, '435 patent, and '468 patent is unenforceable due to the inequitable conduct of one or more persons associated with the filing or prosecution of the applications for those patents and/or the prosecution of the reexaminations of those patents.

92.     As detailed more fully below, one or more persons owing duties of disclosure and candor to the USPTO breached those duties by failing to disclose material information relating to (a) an FDA-approved aseptic bottling machine sold and operating in the United States well before the alleged invention, (b) European aseptic packaging technologies researched by Steuben and forming the basis for Mr. Taggart's alleged inventions, and (c) inventorship of one or more claimed inventions by individuals other than Mr. Taggart, and by making arguments inconsistent with the withheld information.

93.     Also as detailed more fully below, one or more persons owing duties of disclosure and candor to the USPTO—specifically Mr. Taggart—breached those duties by making material misrepresentations in declarations submitted to the USPTO. The attorneys responsible for submitting Mr. Taggart's declarations also breached their duties of disclosure and candor, to the extent that they submitted the declarations with knowledge of their misleading nature.

***Parties Owing a Duty of Disclosure***

94.     Steuben, Thomas D. Taggart, and/or their counsel, including Arlen L. Olsen, were associated with the filing or prosecution of the applications for the '013 patent, '188 patent, '435 patent, and '468 patent. Accordingly, each such person had a duty of disclosure that required them to disclose information material to patentability and had a duty of candor to the USPTO.

95.     Steuben, Mr. Taggart, and/or their counsel, including Mr. Olsen, Greg H. Gardella, and Kevin B. Laurence, were associated with the prosecution of the reexaminations of the '013 patent, '188 patent, '435 patent, and '468 patent. Accordingly, each such person had a duty of disclosure that required them to disclose information material to patentability and had a duty of candor to the USPTO. One or more in-house Steuben attorneys, including Cook Alciati and Charlie Avigliano, was

(and is) associated with the prosecution of the reexaminations and also had (and continues to have) a duty of disclosure to the USPTO.

96.    During the course of litigation, Steuben has obtained discovery of information material to the patentability of the Patents in Suit. On information and belief, Steuben's litigation counsel, including Messrs. Alciati and Avigliano, as well as Mr. Thomas Fisher (a partner in Mr. Gardella's firm) and Mr. Joseph Stanganelli, were aware of the material information discovered by Steuben. At least Messrs. Alciati, Avigliano, and Fisher had a duty to disclose that material information to the PTO and had a duty of candor that required them to prevent Steuben from making statements inconsistent with the material information discovered during the litigation.

***Pendency of the USPTO Proceedings and the Duty to Disclose and Duty of Candor***

97.    U.S. Patent Application No. 09/330,763 ("the '763 application") was filed on June 11, 1999, and remained pending before the USPTO until at least November 5, 2002, when the '763 application issued as the '435 Patent.

98.    U.S. Patent Application No. 09/781,636 ("the '636 application") was filed on February 12, 2001, and remained pending before the USPTO until at least November 19, 2002, when the '636 application issued as the '468 patent.

99.    U.S. Patent Application No. 09/306,552 ("the '552 application") was filed on May 6, 1999, and remained pending before the USPTO until at least March 25, 2003, when the '552 application issued as the '188 Patent.

100.    U.S. Patent Application No. 09/871,078 ("the '078 application") was filed on May 31, 2001, as a divisional of the '552 application, and remained pending before the USPTO until at least September 20, 2004, when the '078 application issued as the '013 patent.

101.    Reexamination Request No. 90/011,072 was filed on June 29, 2010, and

Reexamination Request No. 90/011,357 was filed on November 29, 2010. Those requests remained

pending before the USPTO until at least September 12, 2013, when the Ex Parte Reexamination

Certificate (9834th) for the '188 Patent was issued.

102.    Reexamination Request No. 95/001,452 was filed on November 24, 2010, requesting

reexamination of the '013 Patent. The reexamination remains pending.

103.    Reexamination Request No. 90/012,135 was filed on March 9, 2012, requesting

reexamination of the '435 Patent. Reexamination Request No. 90/013,458 was filed on February 24,

2015, also requesting reexamination of the '435 Patent. On April 14, 2015, proceedings in the two

reexaminations were merged into Reexamination Request No. 90/012,135, which remains pending.

104.    Reexamination Request No. 95/000,686 was filed on September 12, 2012, requesting

reexamination of the '468 Patent. The reexamination remains pending.

105.    During the pendency of each of the proceedings identified in paragraphs 97-104,

Steuben, Mr. Taggart, and the Steuben attorneys associated with each of the proceedings had a duty to

disclose material information to the USPTO and had a duty of candor in their dealings with the

USPTO.

### Information Withheld by Steuben Regarding the Bosch-Abbott machine

106.    By at least September 24, 1998—prior to the filing of any application for the Patents

in Suit—Steuben knew (at least through its employees and officers, Mr. Taggart, Henry Schwartz,

Ken Schlossberg, and Bruce Budinoff) about aseptic bottling machines manufactured by Robert

Bosch GmbH. STEUBEN023248 (HIGHLY CONFIDENTIAL). Steuben also knew this information

as of March 17, 1999. STEUBEN104857 (HIGHLY CONFIDENTIAL).

107.    By at least September 24, 1998, Steuben also knew (at least through Messrs. Taggart,

Schwartz, Schlossberg, and Budinoff) that aseptic bottling machines manufactured by Robert Bosch

**PUBLIC VERSION**

GmbH had been purchased by Abbott/Ross Laboratories (hereinafter the "Bosch-Abbott machines")
in the United States, and had been validated aseptic by the FDA (including meeting the FDA's
requirements for no more than 0.5 ppm hydrogen peroxide residue). STEUBEN023248 (HIGHLY
CONFIDENTIAL). Steuben also knew this information as of March 17, 1999. STEUBEN104857
(HIGHLY CONFIDENTIAL).

108.    By at least September 24, 1998, Steuben also believed (at least through Messrs.
Taggart, Schwartz, Schlossberg, and Budinoff) that the Bosch-Abbott machines had output capacities
of 100 bottles per minute. STEUBEN023248 (HIGHLY CONFIDENTIAL). Steuben also knew this
information as of March 17, 1999. STEUBEN104857 (HIGHLY CONFIDENTIAL).

109.    The Bosch-Abbott machines were prior art to the applications for the Patents in Suit
under at least 35 U.S.C. § 102(b).

110.    Before the applications for the Patents in Suit were filed, Steuben and Mr. Taggart
knew that the Bosch-Abbott machines were prior art to the applications for the Patents in Suit.

111.    Steuben is in possession of documentary evidence of the existence, design, operation,
FDA approval, and on-sale date of the Bosch-Abbott machines, as well as information materially
inconsistent with Steuben's arguments to the USPTO regarding the alleged non-obviousness of
modifying the Bosch-Abbott machines to achieve FDA standards or higher bottle output rates. Among
other things, Steuben is in possession of documents from Abbott describing the Bosch-Abbott
machines and the FDA approval thereof, as well as various brochures describing the Bosch
technologies embodied in the Bosch-Abbott machines. *See* ABT/NES000001; ABT/NES000251;
ABT/NES000346; ABT/NES000444; ABT/NES003026; STEUBEN010563; STEUBEN010581.

112.    Steuben, Mr. Taggart, and/or their counsel were in possession of at least some of the information identified in ¶ 111 during the pendency of one or more USPTO proceedings concerning the Patents in Suit (including the reexaminations), but did not disclose all such information.

113.    Further, Steuben, Mr. Taggart, and/or their counsel knowingly and willfully withheld (and continue to withhold) from the USPTO the information about the existence of the Bosch-Abbott machines and details about the design and operation of the Bosch-Abbott machine, including published brochures regarding the Bosch-Abbott machines, as well as information materially inconsistent with Steuben's arguments to the USPTO regarding the alleged non-obviousness of modifying the Bosch-Abbott machines to achieve FDA standards or higher bottle output rates. *See*, *e.g.*, STEUBEN010563 ("process is fully sanctioned by the US Food & Drug Administration (FDA)"); STEUBEN010581 (depicting dual-line design achieving 200 bottles per minute); ABT/NES000001 ██████████ ABT/NES000003 ███████████████ (HIGHLY CONFIDENTIAL); ABT/NES000364-369 ████████████ (HIGHLY CONFIDENTIAL); ABT/NES000462-465 ██████████ (HIGHLY CONFIDENTIAL); ABT/NES000255 ██████████████████ (HIGHLY CONFIDENTIAL).

114.    To the extent that Steuben, Mr. Taggart, and/or Steuben's attorneys disclosed some information regarding the Bosch-Abbott machines (e.g., a single Bosch brochure ultimately submitted during prosecution of the '013 Patent, but never submitted during prosecution of the '188 Patent), they did so in deceptive fashion intended to conceal the critical elements of the information and to create the appearance that the Bosch-Abbott machine design was merely speculative or aspirational.

115.    The withheld information is material to the patentability of the Patents in Suit, and Steuben, Mr. Taggart, and/or Steuben's attorneys knew or believed during the pendency of one or

more matters at the USPTO that the information was material to the patentability of the Patents in Suit.

116.    The materiality of the withheld information is self-evident in view of several statements made by Steuben to the USPTO in support of patentability, which are materially inconsistent with the withheld information, including the statements detailed in ¶¶ 128-157, below.

117.    As set forth more fully below in, e.g., ¶¶ 128-157, the withheld information regarding the Bosch-Abbott machines was material to the patentability of the Patents in Suit, and but for these omissions, the Patents in Suit would not have issued by the USPTO. Among other things, the Bosch-Abbott machines included non-duplicative prior-art disclosures of features on which Steuben, Mr. Taggart, and/or their counsel relied in arguing that the claims of the Patents-in-Suit were patentable over the prior art. For example, the Bosch-Abbott machines were validated by the FDA, a material fact that contradicts Steuben's representations to the USPTO regarding alleged difficulties achieving FDA standards, which Steuben relied on to show secondary considerations of non-obviousness of its claims. As another example, the Bosch-Abbott machines were validated to ███ ████████████████████, which meets the "greater than 100 bottles per minute" limitation on which Steuben relied in obtaining various claims of the Patents in Suit. *See*, *e.g.*, ABT/NES000001 ██████████ (HIGHLY CONFIDENTIAL), ABT/NES000003 ████████ ████ (HIGHLY CONFIDENTIAL). As still another example, the Bosch-Abbott machines achieved ████████████████████████, which meets the "6-log" limitation that Steuben relied on in obtaining, e.g., claims of the '013 and '188 patents. *See, e.g.,* ABT/NES000055-56 (HIGHLY CONFIDENTIAL); ABT/NES000392-440 (HIGHLY CONFIDENTIAL); *compare with* ¶¶ 132, 137, and 147. As yet another example, the Bosch-Abbott machines included zones that necessarily had sterilant concentration ratios of at least 5 to 1, under Steuben's interpretation of the

claims, which meets the limitation on which Steuben relied in obtaining various claims of the '435 Patent.

118.    Indeed, Steuben has *admitted* the materiality of information about the Bosch-Abbott machine. On November 21, 2003, Steuben's attorney, Joseph Christian (then an associate at Mr. Olsen's firm), argued to the FDA for Freedom of Information Act ("FOIA") release of certain information about the Bosch-Abbott machine. STEUBEN105818 (HIGHLY CONFIDENTIAL). According to Mr. Christian, "[a]s part of our patenting prosecution process, we are *required to provide* to the Patent Office the throughput value of the Bosch system registered and being used by the Ross Products Division of Abbott Laboratories," and "[t]his throughput value cannot be a trade secret because the value is publicly known." *Id.* Mr. Christian participated personally in the prosecution of the application for the '013 patent; therefore, he had a duty to disclose material information at least during the prosecution of the '013 patent.

119.    On information and belief, Steuben, Mr. Taggart, and/or their counsel made a deliberate decision to withhold material information about the Bosch-Abbott machines from the USPTO, and a specific intent to deceive the USPTO is the single most reasonable inference to be drawn from the evidence, as further detailed below, e.g., in ¶¶ 128-157.

120.    Steuben, Mr. Taggart, and/or their counsel also knew or believed that the information withheld from the USPTO regarding the Bosch-Abbott machines was material, at least because they believed that the distinctions that they identified between the Bosch-Abbott machines and the alleged invention of the Patents in Suit are not recited in all of the claims that ultimately issued in the Patents in Suit. *See* STEUBEN105113. On information and belief, Steuben, Mr. Taggart, and/or their counsel made a deliberate decision to withhold this material information, and a specific intent to deceive the USPTO is the single most reasonable inference to be drawn from the evidence.

PUBLIC VERSION

121.    Furthermore, the evidence of the knowledge of Steuben, Mr. Taggart, and/or their counsel regarding the Bosch-Abbott machines, as well as the evidence of their subjective beliefs about the materiality of the Bosch-Abbott machines, combined with their omissions and representations made to the USPTO prove affirmative egregious misconduct, e.g., a deliberately planned and carefully executed scheme to defraud the USPTO. The evidence suggests that Steuben engaged deliberate efforts to claim an invention much broader than anything Mr. Taggart may actually have invented— including claims that would read on features of the prior-art Bosch-Abbott machines—without providing the USPTO with material information about the Bosch-Abbott machines.

***Inequitable Conduct Specifically During Prosecution of the '013 Patent Relating to Steuben's Knowledge of the Bosch-Abbott machines***

122.    Several claims filed with the original application for the '013 patent recited an output rate of "greater than 100 bottles per minute," including original claims 1, 20, 21, and 22. That limitation is required by every issued claim of the '013 patent.

123.    The "100 bottles per minute" threshold recited in original claims 1, 20, 21, and 22 bears no apparent relationship to the embodiment disclosed in the specification of the '013 patent, as that embodiment purports to output 12 bottles every two seconds, or 360 bottles per minute. *See* '013 Patent, col. 7:38-47 (12-bottle matrix); 7:5-9 (matrix of bottles advances every 2 seconds).

124.    Given the knowledge of Steuben, Mr. Taggart, and/or their counsel regarding the 100-bottle-per-minute Bosch-Abbott machine (*see* ¶ 108 above), and the lack of any basis in the specification for a 100-bottle-per-minute threshold, the single most reasonable inference to be drawn from the evidence is that Steuben included the "greater than 100 bottles per minute" limitation specifically with the Bosch-Abbott machine in mind. Yet Steuben, Mr. Taggart, and their counsel withheld information about the Bosch-Abbott machine when they filed original claims 1, 20, 21, and 22 of the application for the '013 patent.

**PUBLIC VERSION**

125.    The withheld information about the Bosch-Abbott machine was material to patentability because the difference between 100-bottles-per-minute (as Steuben believed the Bosch-Abbott machine to have achieved) and 101-bottles-per-minute (as Steuben claimed) is not a patentable distinction. The withheld information is particularly material given that the Bosch-Abbott machine actually was ███████████████████████████████████████████████████ ██████████████████████. *See* ABT/NES000003 (HIGHLY CONFIDENTIAL); ABT/NES000358 (HIGHLY CONFIDENTIAL); ABT/NES000462 (HIGHLY CONFIDENTIAL); ABT/NES000255 (HIGHLY CONFIDENTIAL).

126.    Several claims filed with the original application for the '013 patent recite a step of filling bottles with "aseptically sterilized foodstuffs," including originally filed claims 1, 20, 21, 22, and 23. That limitation is required by every issued claim of the '013 patent.

127.    Filling bottles with "aseptically sterilized foodstuffs" is an FDA requirement for aseptic processing, as the specification of the '013 patent admits. '013 patent, col. 1:52-55. As noted in ¶ 107 above, Steuben, Mr. Taggart and/or their counsel knew before filing the application for the '013 patent that the Bosch-Abbott machine was FDA-approved and, therefore, that the Bosch-Abbott machine filled its bottles with "aseptically sterilized foodstuffs." Yet Steuben, Mr. Taggart and/or their counsel withheld information about the Bosch-Abbott machine when they filed original claims 1, 20, 21, 22, and 23 of the application for the '013 patent.

128.    During prosecution of the '013 Patent, Steuben's counsel relied on the "aseptically sterilized foodstuffs" limitations of the claims under examination as allegedly distinguishing over the prior art, despite the prior knowledge of Steuben, Mr. Taggart, and/or their counsel that the Bosch-Abbott machine was actually approved by the FDA for aseptic operation. For example, on April 16, 2002, Mr. Olsen argued that the prior art disclosed only "pre-sterilization of containers" and *not*

"aseptically sterilizing foodstuffs," and urged on that basis that "[e]ach and every limitation has not been taught or suggested by the prior art." '078 Application, 4/16/2002 Response at 6. Mr. Olsen made similar arguments on July 12, 2002, and October 18, 2002. '078 Application, 7/12/2002 Response at 7-8 ("there are at a minimum **five** elements that when taken together, in combination, are *beyond any previously known range* in the prior art"), 10/18/2002 Appeal Br. at 5-15. Those arguments are materially inconsistent with the prior knowledge of Steuben, Mr. Taggart, and/or their counsel regarding the Bosch-Abbott machine.

129.    In June 2002, Steuben submitted via Information Disclosure Statement ("IDS") one brochure describing a Bosch machine ("Bosch brochure"). Steuben offered no initial comment on the Bosch brochure, and neither corrected nor retracted the prior statements it had made regarding the state of the art with respect to the art's alleged failure to achieve "aseptic" sterilization of foodstuffs. Nor did Steuben disclose its knowledge of the Bosch-Abbott machine or the other Bosch publications/brochures that were, on information and belief, in its possession.

130.    In an office action dated November 5, 2002, the examiner of the '013 patent application cited the Bosch brochure as the basis to reject various claims of the application as obvious, including original claim 20. The only recited step missing from the Bosch brochure, according to the examiner, was "aseptically filling the bottles with aseptically sterilized foodstuffs," which feature the examiner identified in a secondary reference.

131.    Notwithstanding the examiner's interpretation of the Bosch brochure, Steuben, Mr. Taggart, and/or their counsel knew for a fact that the Bosch company actually *did* achieve "aseptically filling the bottles with aseptically sterilized foodstuffs." *See* ¶ 107 above; *accord* STEUBEN010561 (describing processes of "presterilization of the [food] products" and "[p]roduct preservation by aseptic process"). But Steuben did not disclose its knowledge of those facts to the

patent examiner. To the contrary, on May 2, 2003, Mr. Olsen argued that "it is clearly beyond ordinary skill in the art to reach *inter alia* the **aseptic** level of 'aseptically sterilized foodstuffs', as recited in [the] claims." '078 Application, 5/2/2003 Amendment at 7-8. That argument was materially inconsistent with Steuben's prior knowledge about the Bosch-Abbott machine.

132.    Following Mr. Olsen's May 2, 2003, arguments, the examiner allowed claims 45-47 (which ultimately issued as claims 18-20 of the '013 patent). Those claims recited a "12 log reduction in *Clostridium botulinum*," a "6 log reduction in spore organisms," and that "a residual level of hydrogen peroxide is less than .5 PPM." Steuben has taken the position that those additional features are requirements or at least "guidelines" of the FDA for aseptic processing. On that basis, on information and belief, Steuben, Mr. Taggart, and/or their counsel knew or believed that those additional features were present in the FDA-approved Bosch-Abbott machine. Yet Steuben, Mr. Taggart, and/or their counsel withheld information about the Bosch-Abbott machine. That information was but-for material, because the "12 log reduction in *Clostridium botulinum*," "6 log reduction in spore organisms," and "a residual level of hydrogen peroxide is less than .5 PPM" were the very limitations that the examiner relied on when allowing the claims. The examiner would not have allowed those claims had he been provided the material information regarding the existence of the Bosch-Abbott machine.

133.    Steuben and Mr. Olsen have never corrected or retracted the statements made by Mr. Olsen in material contradiction to their prior knowledge of the Bosch-Abbott machine.

134.    Absent Mr. Olsen's materially inconsistent statements, or at least absent Steuben's withholding of materially inconsistent information, one or more claims of the '013 Patent—including claims 6, 9, 10 and 17-20—would not have issued.

*Inequitable Conduct Specifically During Prosecution of the '188 Patent Relating to Steuben's Knowledge of the Bosch-Abbott machines*

135.    Original claim 1 filed with the application for the '188 patent recited the limitation of "aseptically filling the aseptically disinfected plurality of bottles with the aseptically sterilized foodstuffs." Originally filed claim 21 recited a "means for" such aseptic filling. Filling bottles with "aseptically sterilized foodstuffs" (or a "means for" doing so) is required by every claim of the '188 patent as issued on March 25, 2003.

136.    During prosecution of the application for the '188 patent, Steuben's counsel, Mr. Olsen, argued to the patent examiner that "Aseptically sterilized foodstuffs requires that the foodstuffs be processed using an 'Ultra High Temperature' (UHT) pasteurization process to meet FDA aseptic standards. *[T]his is not taught by the prior art*." '552 Application, 2/21/2001 Response at 2-3 (emphasis added). Mr. Olsen made a similar argument in later submissions. '552 Application, 5/21/2001 Response at 7-8, 10/10/2001 Appeal Br. at 5-6. Mr. Olsen's arguments were materially inconsistent with the prior knowledge held by Steuben, Mr. Taggart, and/or Steuben's counsel regarding the Bosch-Abbott machine, as noted in ¶ 107. That information was but-for material, because the recited limitation of "aseptically sterilized foodstuffs" was specifically relied on by the Board of Patent Appeals and Interferences when reversing the examiner's rejections of the claims. '552 Application, 11/26/2002 Board Decision at 7-8.

137.    Also in the May 21, 2001, Response, and October 10, 2001, Appeal Brief, Mr. Olsen argued that the "12 log reduction in *Clostridium botulinum*," "6 log reduction in spore organisms," and "residual level of hydrogen peroxide is less than .5 PPM" features of examined claims 17-19 were not achieved by the prior art. '552 Application, 5/21/2001 Response at 9-10 ("To date, there has been no invention(s), when taken alone or in combination, that together discloses the claimed rate of filling of *bottles* for foodstuffs and at the claimed *levels of sterilization*."), 10/10/2001 Appeal Br. at 6-7.

Steuben has taken the position that those additional features are requirements or at least "guidelines" of the FDA for aseptic processing. On that basis, on information and belief, Steuben, Mr. Taggart, and/or their counsel knew or believed that those additional features were present in the FDA-approved Bosch-Abbott machine. Yet Steuben, Mr. Taggart, and/or their counsel withheld information about the Bosch-Abbott machine. That information was but-for material, because Steuben's characterization of the requirements for FDA compliance—including the "12 log reduction in Clostridium botulinum" and "6 log reduction in spore organisms"—were specifically relied on by the Board of Patent Appeals and Interferences when reversing the examiner's rejections of the claims. '552 Application, 11/26/2002 Board Decision at 7-8.

138.    Steuben and Mr. Olsen have never corrected or retracted the statements made by Mr. Olsen in material contradiction to their prior knowledge of the Bosch-Abbott machine.

139.    Absent Mr. Olsen's materially inconsistent statements, or at least absent Steuben's withholding of materially inconsistent information, one or more claims of the '188 Patent—including claims 1, 17, and 20—would not have issued.

140.    Indeed, the but-for materiality of the withheld information is confirmed by the subsequent cancellation of claims 1, 17, and 20 in the reexamination of the '188 Patent. When the reexamination requester provided the examiner additional information about the state of the art— including additional information about Bosch's technologies and about the art's abilities to achieve aseptic sterilization of foodstuffs—the examiner found the claims unpatentable and Steuben canceled them.

***Inequitable Conduct Specifically During Prosecution of the '435 Patent Relating to Steuben's Knowledge of the Bosch-Abbott machines***

141.    During prosecution of the application for the '435 patent, Steuben amended the claims to require that sterilant concentration levels across a plurality of zones be "maintained at a ratio of at

least about 5 to 1." '763 Application, 7/25/2002 Response at 12-14. Through its attorney, Mr. Olsen,

Steuben relied on those amendments to argue for patentability. *Id.* at 8-10.

142.    Steuben has taken the position in this litigation that a machine will satisfy the "ratio of

at least about 5 to 1" limitation of the claims of the '435 patent if the "sterilant used to sterilize the

bottles in the sterilization zone includes hydrogen peroxide and 4,500 ppm of peracetic acid" and

"[t]he concentration of peroxides is less than 0.2 ppm on the filled and capped bottles."

143.    Based on Steuben's understanding of the scope of the "5 to 1" ratio recited in the

claims of the '435 patent, by at least September 24, 1998, Steuben knew or should have known (at

least through Messrs. Taggart, Schwartz, Schlossberg, and Budinoff) that the Bosch-Abbott machines

necessarily had zones with sterilant concentration ratios greater than 5 to 1 as recited in the claims of

the '435 patent. STEUBEN023248 (HIGHLY CONFIDENTIAL). On information and belief,

Steuben also knew or should have known this information as of March 17, 1999. STEUBEN104857

(HIGHLY CONFIDENTIAL).

144.    Steuben and Mr. Olsen have never corrected or retracted the statements made by

Mr. Olsen in material contradiction to their prior knowledge of the Bosch-Abbott machine.

145.    Absent Mr. Olsen's materially inconsistent arguments, or at least absent Steuben's

withholding of materially inconsistent information, none of the claims of the '435 Patent would have

issued.

***Inequitable Conduct Specifically During Reexamination of the Patents in Suit Relating to Steuben's Knowledge of the Bosch-Abbott machines***

146.    During reexamination of the Patents in Suit, Steuben (including through its counsel,

Messrs. Olsen and Gardella) has repeatedly argued that the art was unable to achieve high-speed

aseptic bottling or achieve FDA aseptic standards. Those arguments are materially inconsistent with

the discovery that Steuben (including Messrs. Alciati, Avigliano, and Fisher) has obtained in the litigation regarding the Bosch-Abbott machines.

147.    For example, during reexamination of the '013 patent, Steuben (through Mr. Gardella) argued to the PTO that aseptically disinfecting bottles is "highly unpredictable" and "often met with failure." '013 Reexam, 12/24/2014 Appeal Br. at 10-14. As support for its argument, Steuben identified a number of alleged industry failures to create a commercially successful machine (*id.*); however, Steuben withheld the information in its possession regarding the capabilities and successful FDA validation of the Bosch-Abbott machines. Instead, as to the Bosch-Abbott machines, Steuben (through Mr. Laurence) argued that "there is no public evidence of record to suggest that the machine disclosed in the ZFL/Bosch references achieved FDA-compliant LAASF processes with plastic bottles at a rate or greater than 100 BPM." '013 Reexam, 5/23/2014 Reply at 23-34. Steuben made similar arguments about the alleged failures in the art during reexamination of the '435 patent ('435 Reexam, 10/12/2015 Response at 34-39 (submitted by Mr. Gardella)) and '468 patent ('468 Reexam, 12/16/2014 Appeal Br. at 20-29 (submitted by Mr. Gardella)). Steuben also specifically argued in distinguishing the Buchner reference—which describes a version of the Bosch-Abbott machines—that "[s]terilization of spore organisms to [a 6 log] level on bottles *had not been achieved prior to the Patent Owner's invention*." '013 Reexam, 11/28/2012 Response at 47. Steuben knows that statement is false, at least from discovery from Abbott. *See, e.g.,* ABT/NES000055-56 (HIGHLY CONFIDENTIAL); ABT/NES000392-440 (HIGHLY CONFIDENTIAL). Steuben has not corrected its materially false statement.

148.    As another example, during reexamination of the '188 patent, Steuben (through Mr. Olsen) argued to the PTO that the art had not been able to achieve "high speed" bottling that met "FDA requirements," and specifically argued that Abbott had not been able to do so. '188 Reexam,

PUBLIC VERSION

12/17/2012 Response at 57-62. Steuben also argued that Abbott "entered into a license agreement with [Steuben] in order to allow it to continue to maximize its profits by aseptically sterilizing and filling bottles at a rate greater than 100 bottles per minute to the standard required by the FDA" and that Abbott could not achieve such results without the "elements of the claimed invention and embodiments in the written description" of the Patents in Suit. *Id.* at 59-60. Steuben also argued that Bosch "never enabled" bottling outputs of 100 bottles per minute. *Id.* at 64. Steuben made similar arguments about Abbott's alleged inability to meet FDA standards "without a license from [Steuben] of claims that describe methods that are essential to the aseptic production of foodstuffs in bottles." '468 Reexam, 1/14/2013 Response at 35-36.

149.    At the same time Steuben was presenting these, and other, arguments to the PTO during reexamination, Steuben *knew* from Abbott's document production that the Bosch-Abbott machine actually *did* achieve FDA aseptic validation for ███████████████████████████ ██████████████████████████████████████████ and *knew* that the Bosch-Abbott machine achieved ████████████████████████. Steuben, however, did not disclose that materially inconsistent information to the PTO. Individuals having such knowledge and duties of disclosure/candor to the USPTO include Messrs. Alciati, Avigliano, and Fisher.

150.    The information about the Bosch-Abbott machines that Steuben has withheld from the PTO is material, at least because it is materially inconsistent with arguments that Steuben has presented to the PTO regarding the art's ability to achieve FDA aseptic standards and Bosch's/Abbott's ability to achieve FDA aseptic standards and high-speed bottling outputs.

151.    Furthermore, the evidence of the knowledge of Steuben regarding the capabilities and FDA-approval of the Bosch-Abbott machine, combined with their omissions and representations made to the USPTO prove affirmative egregious misconduct, e.g., a deliberately planned and carefully

executed scheme to defraud the USPTO. It appears from the evidence that Steuben determined to

present a case to the USPTO that the art failed to meet FDA standards, while withholding the evidence

in its possession regarding the art's *actual success* in meeting those standards at high bottling outputs.

152.     NUSA expects that Steuben will argue in this case that its disparagement of the art

was limited to the publications *of record* in the reexaminations (e.g., the Bosch brochure and ZFL

article), and that it carefully tailored its arguments to avoid disparaging the capabilities of the prior-art

Bosch-Abbott machine itself. Steuben's arguments, however, are not so limited. To the contrary,

Steuben argued both implicitly and explicitly about alleged failures of the *prior art* generally. And

Steuben's arguments reveal an egregiously misleading double standard. Out of one side of its mouth,

Steuben urges that alleged failures of actual aseptic machines (e.g., those of KHS, Hamba, and GEA)

support a finding patentability, regardless of the lack of record evidence about the actual designs and

operational details of those machines. But out of the other side of its mouth, Steuben would argue that

the actual *successes* of the Bosch-Abbott machines are immaterial. Steuben's double-standard is

further evidence of its egregious misconduct and misleading behavior toward the USPTO.

***Inequitable Conduct Specifically During Reexamination of the '188 Patent Relating to Steuben's
Knowledge of the Bosch-Abbott machines***

153.     During reexamination of the '188 Patent in 2011, Mr. Taggart submitted a sworn

declaration that in 1999 he learned from a "Bosch sales representative . . . that the Bosch aseptic

machine was originally designed for a fill rate of up to 200 bottles per minute, but it could not achieve

a fill rate of even 100 bottles per minute." 1/5/2011 2d. Decl. of T. Taggart ¶¶ 5-6, U.S. Application

No. 90/011,072. Documents created contemporaneously with those alleged communications with

Bosch (i.e., in 1998 and 1999) actually contradict Mr. Taggart's later litigation-driven representations,

and show that Steuben (and Mr. Taggart) believed that 100-bottle-per-minute rates were achieved.

154.    Steuben and Mr. Taggart have never corrected or retracted Mr. Taggart's materially inconsistent statements.

155.    Absent Mr. Taggart's materially inconsistent statements, or at least absent Steuben's withholding of materially inconsistent information, the claims of the '188 Patent would not have issued in a reexamination certificate.

***Inequitable Conduct Specifically During Reexamination of the '468 Patent Relating to Steuben's Knowledge of the Bosch-Abbott machines***

156.    During reexamination of the '468 patent, Steuben (through its attorney, Mr. Olsen) incorporated arguments it had made previously during original prosecution of the '188 patent, i.e., that the term "aseptic" distinguishes the claims (specifically claims 1, 2, 5, and 7) from the prior art. Reexam No. 95/000,686, 1/14/2013 Response at 1-2. Those arguments were materially inconsistent with Steuben's prior knowledge of the Bosch-Abbott machine for at least the same reasons set forth in ¶¶ 135-137.

157.    Neither Steuben nor Mr. Olsen have corrected or retracted Mr. Olsen's materially inconsistent statements. Nor has Steuben or Mr. Olsen submitted the information in their possession regarding the Bosch-Abbott machine, such as the documents Steuben received from Abbott or the Bosch brochures providing additional detail about the design and operation of the Bosch-Abbott machine.

***Inequitable Conduct for Withholding Information About European Aseptic Bottling Machines***

158.    On information and belief, beginning in or about 1994, Steuben and its employees, including Messrs. Taggart, Schwartz. Schlossberg, and Budinoff, researched various European ESL and aseptic packaging technologies for purchase by Steuben, including at least ESL and/or aseptic packaging technologies of Ampack Ammann GmbH ("Ampack Ammann"), Stork Food and Dairy

Systems, B.V. ("Stork"), and Serac Group ("Serac"). STEUBEN104857 (HIGHLY

CONFIDENTIAL); NUSA0242523.

159.    On information and belief, more than one year before the filing of the applications for

the Patents in Suit, one or more European ESL and aseptic companies—including at least Ampack

Ammann and Serac—sold or offered for sale to Steuben (a U.S. company) one or more ESL or

aseptic packaging technologies. *See* NUSA0242523, NUSA0242525.

160.    The sales or offers to sell identified in paragraph 159 qualified as prior art to the

Patents in Suit at least under 35 U.S.C. § 102(b).

161.    Technical information in the sales or offers to sell identified in paragraph 159, and

other technical information obtained by Steuben pursuant to its research of European technologies

qualified as prior art to the Patents in Suit at least under 35 U.S.C. § 102(a) and § 102(f).

162.    As one example of Steuben's research of European aseptic technologies, beginning in

or around 1994, Steuben and Messrs. Taggart, Schwartz, Schlossberg, and Budinoff reviewed the state

of the art in ESL and European aseptic bottle fillers, including by visiting European trade shows,

talking with equipment vendors, and visiting European dairies. STEUBEN023248 (HIGHLY

CONFIDENTIAL).

163.    On information and belief, Steuben, Mr. Taggart, and/or their counsel did not disclose

to the USPTO material information collected during the course of Steuben's research of European

aseptic technologies.

164.    As another example of Steuben's research of European ESL and/or aseptic

technologies (and of Steuben's purchases or receipt of offers to purchase such technologies), in 1983

Steuben purchased ███████████ filling machines from the Gasti company. STEUBEN023248

(HIGHLY CONFIDENTIAL). On information and belief, the Gasti machines, or one or more other

cup-filling machines ██████████████████████, included a sterilant application system including measuring cups and a spoon dipper, which are prior-art disclosures material to what Mr. Taggart later claimed to have invented. *See* '013 Reexam, 4/1/2011 Decl. of T. Taggart ¶ 33; '188 Reexam, 1/5/2011 Decl. of T. Taggart ¶ 58; *compare with* STEUBEN023351-53 (Sept. 17, 1998, ██████ quotation for sterilant applicator) (HIGHLY CONFIDENTIAL); STEUBEN085214 (Mar. 29, 1999, email from T. Taggart) (██████████████████████████) (HIGHLY CONFIDENTIAL).

165.     On information and belief, Steuben's purported development of the alleged inventions claimed in the Patents in Suit was based on modifications or planned modifications to the Gasti machines that Steuben purchased in 1983. STEUBEN023248 (HIGHLY CONFIDENTIAL).

166.     Steuben, Mr. Taggart, and/or their counsel did not disclose the Gasti machines or Steuben's prior purchase of the Gasti machines to the USPTO.

167.     As yet another example of Steuben's research of European aseptic technologies, in approximately May 1996, Steuben learned of an aseptic filling machine designed by Ampack Ammann at the 1996 INTERPACK conference, through its employees, Messrs. Taggart, Schlossberg, and Budinoff. *See* NUSA0242547-548. On information and belief, Ampack Ammann demonstrated an aseptic packaging machine during the 1996 INTERPACK conference. Also on information and belief, other European aseptic packaging companies demonstrated aseptic packaging machines during the 1996 INTERPACK conference.

168.     On or around September 16, 1997, Ampack Ammann provided additional information to Steuben regarding the design of its aseptic filling machine. NUSA0242525. That information included a drawing of Ampack Ammann's single-lane carousel-based machine, a disclosure of an inductive flow meter used in Ampack Ammann's filler, a description of Ampack Ammann's bottle-

sterilization process (including air flows, sterilant consumption, container heating temperatures, container heating times, and container drying times), a disclosure of Ampack Ammann's 5-lane sterilization process, a disclosure that Ampack Ammann's machine could achieve outputs of up to 9,000 bottles per hour, and a disclosure that Ampack Ammann machines could achieve outputs of up to 50,000 cups or jars per hour. *Id.* at NUSA0242525-546.

169.    On or around November 4, 1997, several Steuben employees, including Messrs. Taggart, Schlossberg, and Budinger, met with Mr. Eberhard Meinikheim (a representative of Ampack Ammann) in Elma, New York. NUSA0242521. During that meeting, Steuben received information from Mr. Meinikheim regarding the design and operation of Ampack Ammann's aseptic bottling machines, and discussed purchasing an aseptic bottling machine from Ampack Ammann. *Id.* at NUSA0242523.

170.    On or around May 27, 1999, Steuben received from Ampack Ammann an offer to purchase an aseptic filling machine with a modular multi-lane design that could be lengthened to meet design requirements and various output requirements, including outputs up to 14,400 containers per hour. NUSA0242550-607. Among other things, the offer provided an overview of Ampack Ammann's sterilization process, including sterilant concentration, sterilant consumption, container heating temperature, container heating time, and container drying time. *Id.*

171.    On or around October 26, 1999, Steuben received from Ampack Ammann an offer to purchase an aseptic filling machine having an output capacity of greater than 100 containers per minute. NUSA0242609-613.

172.    On information and belief, as another example of Steuben's research of and/or receipt of offers to purchase aseptic packaging technologies from European aseptic packaging, at least by

PUBLIC VERSION

November 1997, Steuben had received an offer to purchase an 18,000-bottle-per-hour aseptic filling machine from the Serac company. NUSA0242523.

173.    On information and belief, Mr. Taggart claimed Ampack Ammann's technology as his own in the applications that issued as the Patents in Suit, including at least Ampack Ammann's technologies regarding sterilant application and drying, or obvious variations thereof. Steuben has represented that the sterilant application and drying parameters, *inter alia*, are critical to the alleged invention. Based on those representations, on information and belief, the Ampack Ammann technology formed the basis for the inventions claimed in at least claims 1-20 of the '013 patent, original claims 1-20 of the '188 patent, claims 1-37 of the '435 patent, and claims 1-35 of the '468 patent (insofar as those claims are alleged to require compliance with FDA aseptic standards).

174.    Steuben, Mr. Taggart, and its attorneys did not disclose to the USPTO the sales or offers to sell identified in paragraph 159, or the technical information identified in paragraph 161, during prosecution of one or more of the applications for the Patents in Suit.

175.    Steuben, Mr. Taggart, and its attorneys did not disclose to the USPTO the origin of the Ampack Ammann technology claimed by Mr. Taggart in the Patents in Suit, such as the information identified in paragraphs 168, 170, and 171.

176.    Steuben, Mr. Taggart, and/or their counsel knowingly and willfully withheld from the USPTO information about the sales or offers to sell identified in paragraphs 159, and 168-171, or the technical information identified in paragraphs 161, and 168-171, and the origin of the Ampack Ammann technology claimed by Mr. Taggart in the Patents in Suit (such as the information identified in paragraphs 168-171) during prosecution of the applications for the Patents in Suit.

177.    Steuben, Mr. Taggart, and/or their counsel knowingly and willfully withheld from the USPTO information about the sales or offers to sell identified in paragraph paragraphs 159, and 168-

171, or the technical information identified in paragraphs 161, and 168-171, and the origin of the

Ampack Ammann technology claimed by Mr. Taggart in the Patents in Suit (such as the information

identified in paragraphs 168-171) during prosecution of the reexaminations of the Patents in Suit.

178.    The withheld information regarding the European packaging technologies and sales

and offers for sale was material to the patentability of the Patents in Suit, and but for these omissions,

one or more claims of the Patents in Suit would not have issued by the USPTO. Among other things,

the European packaging technologies included non-duplicative prior-art disclosures of features on

which Steuben, Mr. Taggart, and/or their counsel relied in arguing that the claims of the Patents-in-

Suit were patentable over the prior art. For example, the European packaging technologies included

output rates of over 100 bottles per minute, which meets the "greater than 100 bottles per minute"

limitation on which Steuben relied in obtaining various claims of the Patents in Suit, including claims

of the '188 patent and '013 patent. NUSA0242523, NUSA0242540. As another example, the

European packaging technologies—particularly that of Ampack Ammann—taught to aseptically

disinfect bottles in an "upright position," which feature Steuben relied on to obtain certain claims of

the '013 patent, including claim 1. *See* NUSA0242541, NUSA0242527. As yet another example, the

European packaging technologies included zones that necessarily had sterilant concentration ratios of

at least 5 to 1, which meets the limitation on which Steuben relied in obtaining the claims of the '435

Patent. *See* NUSA0242527. On information and belief, Steuben, Mr. Taggart, and/or their counsel

knew or believed that such information was material and made a deliberate decision to withhold it,

and a specific intent to deceive the USPTO is the single most reasonable inference to be drawn from

the evidence.

179.    Although NUSA is continuing to discover the information that Steuben collected

regarding European packaging technologies, on information and belief, such information also is

material to the inventorship of the Patents in Suit. To the extent that Mr. Taggart's alleged inventions originated with another—e.g., one or more engineers from Ampack Ammann—that other person should have been named as an inventor on the Patents in Suit. Without naming proper inventors, a patent is invalid; therefore, the failure of Steuben, Mr. Taggart, and/or their counsel to name the proper inventors of the claimed inventions renders the patents invalid, making the information about inventorship but-for material.

180.    For at least the same reasons stated in paragraphs 178 and 179, the withheld information regarding the European packaging technologies and sales and offers for sale also was (and is) "but-for" material to the patentability of the Patents in Suit in reexamination. On information and belief, Steuben, Mr. Taggart, and/or their counsel knew or believed that such information was (and is) material and made a deliberate decision to withhold it, and a specific intent to deceive the USPTO is the single most reasonable inference to be drawn from the evidence.

181.    Steuben, Mr. Taggart, and/or their counsel also knew or believed that the information withheld from the USPTO regarding the European packaging technologies was material, at least because the distinctions that they identified between the European packaging technologies and the alleged invention of the Patents in Suit are not recited in all of the claims that ultimately issued in the Patents in Suit. *See* STEUBEN105113. Steuben, Mr. Taggart, and/or their counsel made a deliberate decision to withhold this material information, and a specific intent to deceive the USPTO is the single most reasonable inference to be drawn from the evidence.

182.    Furthermore, the evidence of the knowledge of Steuben, Mr. Taggart, and/or their counsel regarding the European packaging technologies, as well as the evidence of their subjective beliefs about the materiality of the European packaging technologies, combined with their omissions and representations made to the USPTO prove affirmative egregious misconduct, e.g., a deliberately

planned and carefully executed scheme to defraud the USPTO. The evidence suggests that Steuben

engaged in a years-long campaign to collect information about European packaging technologies,

combine those technologies into a U.S. patent application, and pass off the technologies as being the

invention of Mr. Taggart without disclosing the origin of those technologies to the USPTO.

***Inequitable Conduct in Connection with Mr. Taggart's Declarations Submitted During
Reexaminations of the '013 Patent and '188 Patent***

183.    On April 1, 2011, in connection with the reexamination of the '013 patent,

Mr. Taggart—through Steuben's attorney, Mr. Olsen—submitted a declaration attesting to his

"solution" to the alleged problem of "how to sterilize the surface of the packaging material at a high

processing speed, yet being in compliance of not more than 0.5 part per million of hydrogen

peroxide." '013 Reexam, 4/1/2011 Decl. of T. Taggart ¶ 32. According to Mr. Taggart, "[m]y solution

was to provide a metering or measuring system and an atomizer in the form of a venturi and a double

heat exchanger for vaporization as I more fully described in the '013 patent." *Id.* ¶ 33. Mr. Taggart

made a similar statement in a declaration submitted during reexamination of the '188 patent. '188

Reexam, 1/5/2011 Decl. of T. Taggart ¶ 58.

184.    Mr. Taggart did not invent the use of a metering or measuring system and an atomizer

in the form of a venturi and a double heat exchanger for vaporization as described in the '013 patent or

'188 patent, and Mr. Taggart knew that fact before he submitted his declarations. *See*

STEUBEN023351-53 (Sept. 17, 1998, ██████ quotation for sterilant applicator) (HIGHLY

CONFIDENTIAL); STEUBEN085214 (Mar. 29, 1999, email from T. Taggart) (██████████

████████████████████) (HIGHLY CONFIDENTIAL).

185.    The metering or measuring system and atomizer described in the '013 and '188

patents are technologies that were well known in the art before Mr. Taggart's purported invention,

including, on information and belief, from technologies belonging to the Hamba and/or Gasti companies.

186. To the extent that modifications were made to the preexisting Hamba/Gasti design for sterilant application, those modifications were conceived of by Mr. Daniel Newitt, not Mr. Taggart. *See* STEUBEN085217 (HIGHLY CONFIDENTIAL).

187. The false statements in Mr. Taggart's declaration regarding the origin of his "invention" are *per se* material and give rise to inequitable conduct before the USPTO.

***Inequitable Conduct in Connection with Omitting Daniel Newitt From the List of Named Inventors***

188. During prosecution of the application for the '435 patent, Steuben amended the claims to require that sterilant concentration levels across a plurality of zones be "maintained at a ratio of at least about 5 to 1." '763 Application, 7/25/2002 Response at 12-14. Through its attorney, Mr. Olsen, Steuben relied on those amendments to argue for patentability. *Id.* at 8-10.

189. The mechanism described in the '435 patent for achieving the "5 to 1" ratio depends on the use of "partitions" between zones. '435 patent, col. 9:51-col. 10:2; *accord* '188 Reexam, 1/5/2011 Decl. of T. Taggart ¶ 48.

190. Claims 5, 17-19, and 33 of the '435 patent specifically recite the use of a partition between zones.

191. Mr. Taggart did not conceive of the alleged inventive idea to use partitions to create zones, or at least he did not alone conceive of that alleged inventive idea. Rather, Mr. Taggart got the idea to use partitions from Mr. Newitt. *See* STEUBEN023143-144 (HIGHLY CONFIDENTIAL). On information and belief, Mr. Newitt is an inventor, if not the sole inventor, of the '435 patent, to the extent that those claims are patentable over the prior art.

192.    Without naming proper inventors, a patent is invalid; therefore, the failure of Steuben, Mr. Taggart, and/or their counsel to name the proper inventors of the invention claimed in the '435 patent renders the patent invalid, making the information about inventorship but-for material.

193.    Had Steuben, Mr. Taggart, and/or their counsel disclosed the material information about inventorship during examination, the '435 patent would not have issued to Mr. Taggart as the sole inventor.

194.    NUSA is continuing to discover information about Mr. Newitt's role in the conception of the alleged inventions claimed in the Patents in Suit, and NUSA will seek leave to move to amend its pleadings to add additional affirmative defenses and/or counterclaims based on Mr. Newitt's inventorship as further discovery warrants.

## COUNTERCLAIMS

195.    NUSA asserts the following counterclaims against Plaintiff and alleges as follows:

196.    NUSA asserts a declaratory judgment counterclaim for a declaration of noninfringement and invalidity of all claims of U.S. Patent Nos. 6,945,013 ("the '013 Patent"), 6,536,188 ("the '188 Patent"), 6,481,468 ("the '468 Patent"), 6,475,435 ("the '435 Patent"), and 6,209,591 ("the '591 Patent") (collectively "the Patents in Suit") under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Patent Laws of the United States, 35 U.S.C. § 1 et seq.

197.    NUSA asserts a counterclaim of antitrust violations under Section 2 of the Sherman Act, 15 U.S.C. § 2.

198.    NUSA asserts a counterclaim of tortious interference with prospective business relationship and/or prospective economic advantage under New York law.

199.    NUSA asserts a counterclaim for a declaration under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Patent Laws of the United States, 35 U.S.C. § 1 et seq., that the claims of the Patents in Suit are unenforceable due to inequitable conduct.

PUBLIC VERSION

## PARTIES

200.    NUSA is a Delaware corporation with its principal place of business at 800 North Brand Boulevard, Glendale, California 91203.

201.    On information and belief, as stated in Plaintiff's Complaint, Steuben Foods, Inc., is a New York corporation having a principal place of business at 1150 Maple Road, Elma, New York 14059.

## JURISDICTION AND VENUE

202.    Counterclaim Counts 1-12 arise under the Federal Declaratory Judgment Act, the Sherman Act, and the Patent Laws of the United States, more particularly under 28 U.S.C. §§ 2201 and 2202, 15 U.S.C. § 2, and the 35 U.S.C. § 100 *et seq.*, respectively.  This court has subject matter jurisdiction over such claims under, without limitation, 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 2201.

203.    This court has supplemental jurisdiction over Counterclaim Count 12 under 28 U.S.C. § 1367. This court also has jurisdiction over Counterclaim Count 12 under 28 U.S.C. § 1332 because complete diversity exists and the amount in controversy exceeds $75,000 exclusive of interest and costs.

204.    There is an actual controversy between NUSA and Plaintiff regarding the validity and infringement of the Patents in Suit as evidenced by, for example, Plaintiff's assertion in the Complaint that NUSA infringes the Patents in Suit and NUSA's denial of those assertions, and as to Plaintiff's anticompetitive and unlawful behavior in violation of the Sherman Act.

205.    Plaintiff is subject to personal jurisdiction in this Court as evidenced by, *inter alia*, its consent to jurisdiction in this Court.

206.    Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1391 and 1400 and 15 U.S.C. §§15 or 22.

PUBLIC VERSION

## COUNT ONE
### (Declaratory Judgment – Noninfringement of U.S. Patent No. 6,945,013)

207.    NUSA repeats and incorporates by reference paragraphs 1 through 206 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

208.    Plaintiff has accused NUSA of infringing the '013 Patent.

209.    Plaintiff has created an actual and justiciable controversy between itself and NUSA regarding whether NUSA has infringed any valid and enforceable claim of the '013 Patent.

210.    NUSA has not infringed or actively induced others to infringe any claim of the '013 Patent, either literally or under the doctrine of equivalents.

211.    A judicial declaration of noninfringement of the '013 Patent is necessary and appropriate to resolve this controversy.

## COUNT TWO
### (Declaratory Judgment – Invalidity of U.S. Patent No. 6,945,013)

212.    NUSA repeats the allegations of paragraphs 1 through 211 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

213.    An actual controversy exists between NUSA and Plaintiff as to whether the '013 Patent is valid.

214.    Each of the claims of the '013 Patent are invalid for failure to comply with one or more requirements of patentability under 35 U.S.C. § 101, et seq., including but not limited to the requirements in §§ 102, 103, 112, and the rules, regulations, and/or the laws pertaining thereto.

215.    Claims 6, 9, 10 and 17-20 of the '013 Patent are invalid for the reasons set forth in NUSA's Preliminary Disclosure of Non-Infringement and Invalidity Contentions, served on Steuben on December 4, 2015, and Appendixes A-G to that Preliminary Disclosure, as well as for the reasons to be presented in any subsequent invalidity contentions served under the Court's Scheduling Order and/or with the Court's permission.

PUBLIC VERSION

216.     A judicial declaration of invalidity of the '013 Patent is necessary and appropriate to resolve this controversy.

## COUNT THREE
### (Declaratory Judgment – Noninfringement of U.S. Patent No. 6,536,188)

217.     NUSA repeats and incorporates by reference paragraphs 1 through 216 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

218.     Plaintiff has accused NUSA of infringing the '188 Patent.

219.     Plaintiff has created an actual and justiciable controversy between itself and NUSA regarding whether NUSA has infringed any valid and enforceable claim of the '188 Patent.

220.     NUSA has not infringed or actively induced others to infringe any claim of the '188 Patent, either literally or under the doctrine of equivalents.

221.     A judicial declaration of noninfringement of the '188 Patent is necessary and appropriate to resolve this controversy.

## COUNT FOUR
### (Declaratory Judgment – Invalidity of U.S. Patent No. 6,536,188)

222.     NUSA repeats the allegations of paragraphs 1 through 221 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

223.     An actual controversy exists between NUSA and Plaintiff as to whether the '188 Patent is valid.

224.     Each of the claims of the '188 Patent are invalid for failure to comply with one or more requirements of patentability under 35 U.S.C. § 101, et seq., including but not limited to the requirements in §§ 102, 103, 112, and the rules, regulations, and/or the laws pertaining thereto.

225.     Claims 19, 21, 22, 24, 26, 28, 30, 39, and 40 of the '188 Patent are invalid for the reasons set forth in NUSA's Preliminary Disclosure of Non-Infringement and Invalidity Contentions, served on Steuben on December 4, 2015, and Appendixes H-O thereto, as well as for the reasons to be

presented in any subsequent invalidity contentions served under the Court's Scheduling Order and/or with the Court's permission.

226.    A judicial declaration of invalidity of the '188 Patent is necessary and appropriate to resolve this controversy.

## COUNT FIVE
### (Declaratory Judgment – Noninfringement of U.S. Patent No. 6,481,468)

227.    NUSA repeats and incorporates by reference paragraphs 1 through 226 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

228.    Plaintiff has accused NUSA of infringing the '468 Patent.

229.    Plaintiff has created an actual and justiciable controversy between itself and NUSA regarding whether NUSA has infringed any valid and enforceable claim of the '468 Patent.

230.    NUSA has not infringed or actively induced others to infringe any claim of the '468 Patent, either literally or under the doctrine of equivalents.

231.    A judicial declaration of noninfringement of the '468 Patent is necessary and appropriate to resolve this controversy.

## COUNT SIX
### (Declaratory Judgment – Invalidity of U.S. Patent No. 6,481,468)

232.    NUSA repeats the allegations of paragraphs 1 through 231 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

233.    An actual controversy exists between NUSA and Plaintiff as to whether the '468 Patent is valid.

234.    Each of the claims of the '468 Patent are invalid for failure to comply with one or more requirements of patentability under 35 U.S.C. § 101, et seq., including but not limited to the requirements in §§ 102, 103, 112, and the rules, regulations, and/or the laws pertaining thereto.

235.     Claims 3, 9, 20, 21, 23 of the '468 Patent are invalid for the reasons set forth in NUSA's Preliminary Disclosure of Non-Infringement and Invalidity Contentions, served on Steuben on December 4, 2015, and Appendixes U-Z and AA-AC thereto, as well as for the reasons to be presented in any subsequent invalidity contentions served under the Court's Scheduling Order and/or with the Court's permission.

236.     A judicial declaration of invalidity of the '468 Patent is necessary and appropriate to resolve this controversy.

## COUNT SEVEN
### (Declaratory Judgment – Noninfringement of U.S. Patent No. 6,475,435)

237.     NUSA repeats and incorporates by reference paragraphs 1 through 236 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

238.     Plaintiff has accused NUSA of infringing the '435 Patent.

239.     Plaintiff has created an actual and justiciable controversy between itself and NUSA regarding whether NUSA has infringed any valid and enforceable claim of the '435 Patent.

240.     NUSA has not infringed or actively induced others to infringe any claim of the '435 Patent, either literally or under the doctrine of equivalents.

241.     A judicial declaration of noninfringement of the '435 Patent is necessary and appropriate to resolve this controversy.

## COUNT EIGHT
### (Declaratory Judgment – Invalidity of U.S. Patent No. 6,475,435)

242.     NUSA repeats the allegations of paragraphs 1 through 241 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

243.     An actual controversy exists between NUSA and Plaintiff as to whether the '435 Patent is valid.

PUBLIC VERSION

244.    Each of the claims of the '435 Patent are invalid for failure to comply with one or more requirements of patentability under 35 U.S.C. § 101, et seq., including but not limited to the requirements in §§ 102, 103, 112, and the rules, regulations, and/or the laws pertaining thereto.

245.    Claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, 37 of the '435 Patent are invalid for the reasons set forth in NUSA's Preliminary Disclosure of Non-Infringement and Invalidity Contentions, served on Steuben on December 4, 2015, and Appendixes P-T thereto, as well as for the reasons to be presented in any subsequent invalidity contentions served under the Court's Scheduling Order and/or with the Court's permission.

246.    A judicial declaration of invalidity of the '435 Patent is necessary and appropriate to resolve this controversy.

## COUNT NINE
### (Declaratory Judgment – Noninfringement of U.S. Patent No. 6,209,591)

247.    NUSA repeats and incorporates by reference paragraphs 1 through 246 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

248.    Plaintiff has accused NUSA of infringing the '591 Patent.

249.    Plaintiff has created an actual and justiciable controversy between itself and NUSA regarding whether NUSA has infringed any valid and enforceable claim of the '591 Patent.

250.    NUSA has not infringed or actively induced others to infringe any claim of the '591 Patent, either literally or under the doctrine of equivalents.

251.    A judicial declaration of noninfringement of the '591 Patent is necessary and appropriate to resolve this controversy.

## COUNT TEN
### (Declaratory Judgment – Invalidity of U.S. Patent No. 6,209,591)

252.    NUSA repeats the allegations of paragraphs 1 through 251 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

PUBLIC VERSION

253.    An actual controversy exists between NUSA and Plaintiff as to whether the '591 Patent is valid.

254.    Each of the claims of the '591 Patent are invalid for failure to comply with one or more requirements of patentability under 35 U.S.C. § 101, et seq., including but not limited to the requirements in §§ 102, 103, 112, and the rules, regulations, and/or the laws pertaining thereto.

255.    Claims 1, 2, 17, 26 of the '591 Patent are invalid for the reasons set forth in NUSA's Preliminary Disclosure of Non-Infringement and Invalidity Contentions, served on Steuben on December 4, 2015, and Appendixes AD-AI thereto, as well as for the reasons to be presented in any subsequent invalidity contentions served under the Court's Scheduling Order and/or with the Court's permission.

256.    A judicial declaration of invalidity of the '591 Patent is necessary and appropriate to resolve this controversy.

## COUNT ELEVEN
## (Sham Litigation, Attempted Monopolization Under 15 U.S.C. § 2)

257.    NUSA repeats the allegations of paragraphs 1 through 256 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

258.    Since ███, Nestlé HealthCare Nutrition, Inc. ("Nestlé HealthCare"), a company related to NUSA, has had a contract with Plaintiff for Plaintiff to provide certain limited "co-packing" aseptic packaging services, including aseptic bottling ████████, for Nestlé Healthcare. Through that contract, Nestlé Healthcare engaged Plaintiff to aseptically fill certain Nestlé foodstuffs into Nestlé bottles at Plaintiff's New York bottling facility. Nestlé Healthcare's contract ███████ ████████████████.

PUBLIC VERSION

259.    In 2006, NUSA announced plans to develop an aseptic bottling facility in Anderson, Indiana, at which NUSA would perform its own aseptic bottling. NUSA's announcement was public and, thus, on information and belief, known to Plaintiff.

260.    By 2008, NUSA had installed five aseptic bottling lines supplied by GEA at the Anderson facility, and by October 2008, NUSA's purchase of a sixth GEA aseptic bottling line was publicly announced. Thus, on information and belief, Plaintiff knew that NUSA had built its Anderson facility to accommodate GEA's machines.

261.    At least by September 2012, it was publicly known that NUSA planned to expand the Anderson facility using additional machines supplied by GEA. Thus, on information and belief, by that date, Plaintiff knew that NUSA planned to expand the Anderson facility using additional machines supplied by GEA.

262.    Plaintiff knew that NUSA's continued expansion of the Anderson plant would likely reduce or eliminate Nestlé HealthCare's reliance on Plaintiff's co-packing services. On information and belief, Plaintiff sought to disrupt NUSA's operation of its aseptic bottling facility, and sought to prevent or otherwise interfere with NUSA's planned expansion. On information and belief, Plaintiff understood that NUSA's aseptic bottling facility would have afforded NUSA the economic advantage of being able to bottle Nestlé Healthcare's own product without Plaintiff's involvement.

263.    Plaintiff filed suit against GEA in September 2012, alleging that the machines supplied by GEA infringed five separate patents belonging to Plaintiff—i.e., the same five patents Plaintiff now asserts in its Complaint against NUSA.

264.    On information and belief, Plaintiff filed suit against GEA not to vindicate any legitimate patent right, but rather to force Nestlé Healthcare to continue and expand upon a prior agreement under which Plaintiff had been supplying Nestlé Healthcare with bottle-filling services.

45

PUBLIC VERSION

Plaintiff's objectives are apparent from the timing of its suit against GEA, as well as Plaintiff's communications to NUSA about the GEA suit. Specifically, in October 2012, Steuben sent NUSA a copy of the GEA complaint in a letter regarding "ongoing discussions between Nestlé USA, Inc. ('Nestlé') and Steuben Foods, Inc. ('Steuben') in relation to the possibility of a business and/or license arrangement."

265.    Plaintiff's unlawful litigation objectives are apparent from its efforts between about September 2012 and November 2012 to leverage its patent rights far beyond the limited grant that the patent laws allow. Plaintiff demanded, e.g., that NUSA (1) construct a new bottling facility for Plaintiff, at NUSA's expense *of nearly $70 million*, and (2) agree to a *twenty-five year* commitment to purchase bottling services from Steuben.

266.    Plaintiff's unlawful objectives also are apparent from Plaintiff's delay in accusing NUSA's GEA machines of infringing the patents until it recognized the coercive effect that such accusations might have in Plaintiff's negotiations with NUSA. Plaintiff first began asserting its patents in 2010 against two manufacturers whose machines, like the machines described in Plaintiff's patents, use *hydrogen peroxide* as a bottle sterilant. *See Steuben Foods, Inc. v. Oystar USA, Inc.*, No. 1:10-cv-780; *Steuben Foods, Inc. v. Shibuya Hoppmann Corp.*, No. 1:10-cv-781. Plaintiff waited to sue GEA (and later NUSA) for *years*, likely because Plaintiff understood that its patents were not directed machines using a fundamentally different *peroxyacetic acid* bottle sterilant, as GEA's machines do. Only in 2012, when Steuben sought to pressure NUSA into expanding the parties' relationship, did Steuben determine to file suit against GEA based on its baseless claims of infringement. Tellingly, in the same time period, Steuben began amending its patent claims in an effort to cover GEA's peroxyacetic acid system, which is an implicit recognition that its existing patent claims did *not* cover that machine. (*See* ¶¶ 287-288, *infra*.)

46

267.    At least since Plaintiff first filed its suit against GEA, it has become apparent that Plaintiff has no objectively reasonable or good-faith basis on which to assert its patents—whether against GEA or NUSA. As detailed in the counts below, Plaintiff's filing and continued assertion of its suits against GEA and NUSA (among others) are anticompetitive, tortious and wrongful.

### A.    The Relevant Market

268.    There is a market for aseptically bottling services for low-acid food products in compliance with the United States FDA's regulations governing low-acid aseptic food packaging processes. Geographically, the market's contours generally extend throughout the United States.

269.    For a customer seeking to aseptically fill low-acid food products for the U.S. market, there is no reasonable substitute for using an FDA-compliant low-acid aseptic process. No other process will result in an aseptic product that can be sold into the U.S. market.

270.    Furthermore, non-aseptic processes (e.g., extended shelf-life or ESL) are not acceptable substitutes for FDA-complaint aseptic filling processes for low-acid foods. Such non-aseptic processes result in an entirely different product. For example, low-acid foodstuffs bottled using a non-aseptic process must be *refrigerated* during transportation, at the grocery store, and in the consumer's home. Aseptically bottled low-acid foodstuffs, by contrast, are *shelf-stable*—i.e., they may be transported, sold, and stored in the consumer's home *without refrigeration*. Furthermore, aseptically bottled low-acid foodstuffs have a substantially longer shelf life than non-aseptically bottled low-acid foodstuffs.

271.    As an illustration of the relevant market, Nestlé Healthcare is a customer of NUSA's and Steuben's services for aseptic bottling of Boost® Nutritional Drink. Nestlé Healthcare contracts for FDA-compliant aseptic packaging services to fill its Boost® into its containers. Nestlé Healthcare *cannot* accept a non-FDA-compliant aseptic packaging process, nor can it accept a non-aseptic packaging process. Absent access to FDA-compliant aseptic packaging services for low-acid

foodstuffs, the only alternative for Nestlé Healthcare (and any other similarly situated consumer in the market for such services) is to stop selling its aseptic foodstuffs.

272.    Continuing the example of Nestlé Healthcare, the market of providers from whom Nestlé Healthcare could purchase FDA-aseptic bottling services for its low-acid foodstuffs normally would include NUSA, as well as so-called co-packers such as Steuben and others (e.g., Kan-Pak, HP Hood, and Jasper, whom Steuben also has accused of infringement). As set forth in this counterclaim, however, Steuben unlawfully seeks to monopolize the market so that *only Steuben* and its licensees can provide the bottling services that Nestlé Healthcare and other similarly situated consumers require.

### B.    Plaintiff's Attempted Monopoly

273.    Plaintiff has attempted to monopolize the relevant market by asserting one or more of its patents to cover all commercially feasible FDA-compliant methods of aseptically bottling food products and all commercially feasible FDA-compliant aseptic bottling machines, and by seeking to enjoin the sale and use of such aseptic bottling machines.

274.    There is a dangerous probability that Plaintiff's anticompetitive and/or exclusionary conduct, described below, will succeed in unfairly increasing Plaintiff's market power, including to the point of interfering with NUSA's business position and relationships, and creating an anticompetitive monopoly, at least because Plaintiff asserts the Patents in Suit in a manner that would cover all commercially feasible FDA-compliant aseptic bottling methods in the United States.

### C.    Plaintiff's Sham Litigation

275.    Plaintiff has engaged in anticompetitive and/or exclusionary conduct via sham patent litigation, asserting objectively baseless patent-infringement claims in its September 3, 2013, complaint, as well as in its infringement contentions served on September 15, 2015, September 16, 2015, September 24, 2015, October 9, 2015, and November 6, 2015.

PUBLIC VERSION

276.     Plaintiff's Complaint and its infringement contentions are objectively baseless in that no reasonable plaintiff could reasonably expect to succeed on allegations that NUSA infringes any valid claim of the Patents in Suit (including the claims that Plaintiff asserts in its infringement contentions).

### 1.     Sham Assertion of the '188 Patent

_Extant claims: claims 9, 16, 19, and 21-40_

277.     An *ex parte* reexamination certificate for the '188 Patent issued on September 12, 2013. In the *ex parte* reexamination certificate, claims 1-8, 10-15, 17, 18, and 20 were canceled, claim 16 was amended, and new claims 21-40 were added. Thus, claims 9, 16, 19, and 21-40 are the only currently extant claims of the '188 Patent.

278.     Plaintiff asserts claims 19, 21, 22, 24, 26, 28, 30, 39, and 40 of the '188 Patent against NUSA.

279.     On information and belief, Plaintiff has asserted, and continues to assert, at least claims 19, 21, 22, 24, 26, 28, 30, 39, and 40 of the '188 Patent in its co-pending infringement suit against GEA Procomac ("GEA"), the supplier of NUSA's accused machines.

_Intervening rights as to claims 21, 22, 24, 26, 28, 30, 39, and 40_

280.     Plaintiff materially amended claim 16 during reexamination of the '188 Patent.

281.     Plaintiff newly added claims 21-40 (including asserted claims 21, 22, 24, 26, 28, 30, 39, and 40) of the '188 Patent during reexamination.

282.     NUSA has intervening rights as to claims 16 and 21-40 (including asserted claims 21, 22, 24, 26, 28, 30, 39, and 40) of the '188 Patent.

283.     On information and belief, Plaintiff knew, prior to filing its Complaint, that NUSA would have intervening rights as to any claims added or amended in reexamination, because NUSA

purchased its accused machines and used those machines before the issuance of a reexamination certificate.

*No basis to believe that claim 40 is valid*

284.    Plaintiff knows that the United States Patent and Trademark Office (USPTO) Patent Trial and Appeal Board (PTAB), has determined in an institution decision for *inter partes* review that claim 40 of the '188 Patent is reasonably likely unpatentable.

285.    Based at least on the USPTO PTAB's determination that claim 40 of the '188 Patent is reasonably likely unpatentable, no reasonable plaintiff could reasonably expect to succeed on allegations that NUSA infringes claim 40.

286.    Plaintiff also knows that the USPTO has determined in Reexamination No. 90/013,601 that claim 40 of the '188 Patent is invalid as obvious.

287.    During reexamination of the '188 Patent, on or about December 17, 2012, Steuben submitted an amendment to add new claim 68, which included the limitation, "wherein the peroxyacetic acid and hydrogen peroxide uses a concentration sensor to ensure that the concentration of the peroxyacetic acid and hydrogen peroxide is maintained at a predetermined level." Reexamination claim 68 ultimately issued in a reexamination certificate as claim 40 of the '188 Patent.

288.    During reexamination of the '468 Patent, on or about January 14, 2013, Steuben submitted an amendment to add new claim 41, which included the limitation, "wherein the peroxyacetic acid uses a concentration sensor to ensure that the concentration of the peroxyacetic acid is maintained at a predetermined level."

289.    During reexamination of the '468 Patent, on or about February 13, 2013, Shibuya, the third-party requester of the reexamination, argued that claim 41 lacked enablement and written description, and was indefinite under 35 U.S.C. § 112. As to indefiniteness, Shibuya specifically

argued that "[a]s phrased, the acid is using a sensor as opposed to the system using a sensor or a sensor being used to monitor the concentration. As written, the claim is per se indefinite under 35 U.S.C. § 112 ¶ 2."

290.    On or about April 23, 2013, Examiner Dawson, the reexamination examiner of the '188 Patent, issued an action allowing new claim 68. Examiner Dawson's April 23 action did not address whether claim 68 was indefinite under 35 U.S.C. § 112.

291.    Plaintiff did not inform Examiner Dawson of Shibuya's arguments about claim 41 of the '468 Patent. The '468 Patent reexamination was assigned to a different examiner, Examiner Engle.

292.    On or about July 3, 2014, Examiner Engle rejected new claim 41 of the '468 Patent as lacking enablement, lacking written description, and as being indefinite under 35 U.S.C. § 112. As to indefiniteness, Examiner Engle found claim 41 unpatentable because, "[a]s phrased, the acid is using a sensor as opposed to the system using a sensor or a sensor being used to monitor the concentration."

293.    On or about August 4, 2014, in response to the indefiniteness rejection, Plaintiff requested to cancel claim 41 of the '468 Patent.

294.    In its August 4, 2014, response, Plaintiff did not argue that claim 41 of the '468 Patent was definite.

295.    At no point in the reexamination of the '468 Patent did Plaintiff dispute the PTO examiner's indefiniteness rejection of claim 41.

296.    The PTO refused to grant Plaintiff's request to cancel claim 41 of the '468 Patent.

297.    Because claim 41 was not canceled during reexamination, the rejection of claim 41 remained in place after the close of reexamination prosecution.

298.   On or about December 16, 2014, Plaintiff filed an appeal brief on appeal from the reexamination of the '468 Patent. Plaintiff acknowledged the PTO's refusal to cancel claim 41, but Plaintiff declined to appeal the rejection of claim 41.

299.   On or about March 6, 2015, Shibuya filed a response brief on appeal from the reexamination of the '468 Patent. Shibuya pointed out that Plaintiff's reexamination appeal brief did not identify claim 41 as an issue to be addressed on appeal, and that the rejection of claim 41 should thus be affirmed *pro forma*.

300.   Claim 40 of the '188 Patent suffers from the same indefiniteness defect as claim 41 of the reexamined '468 Patent—i.e., "[a]s phrased, the acid [and peroxide] is using a sensor as opposed to the system using a sensor or a sensor being used to monitor the concentration," making the claim indefinite *per se*.

301.   Based at least on (a) Shibuya's February 13, 2013, submission in the '468 Patent reexamination, (b) Examiner Engle's July 3, 2014, rejection of claim 41 of the '468 Patent, (c) Plaintiff's decision on or about August 14, 2014, not to dispute the indefiniteness rejection of claim 41, (d) Plaintiff's decision on or about December 16, 2014, not to appeal the indefiniteness rejection of claim 41, and (e) Shibuya's recognition in its appeal brief that the indefiniteness rejection of claim 41 is not appealed, Plaintiff knows that claim 40 of the '188 Patent is indefinite for its recitation of "wherein the peroxyacetic acid and hydrogen peroxide uses a concentration sensor to ensure that the concentration of the peroxyacetic acid and hydrogen peroxide is maintained at a predetermined level."

302.   Based at least on (a) Shibuya's February 13, 2013, submission in the '468 Patent reexamination, (b) Examiner Engle's July 3, 2014, rejection of claim 41, (c) Plaintiff's decision on or about August 14, 2014, not to dispute the indefiniteness rejection of claim 41, (d) Plaintiff's decision

on or about December 16, 2014, not to appeal the indefiniteness rejection of claim 41, and

(e) Shibuya's recognition in its appeal brief that the indefiniteness rejection of claim 41 is not

appealed, no reasonable plaintiff could reasonably expect to succeed on allegations that NUSA

infringes claim 40.

303.    Steuben is estopped from arguing that claim 40 of the '188 Patent is not indefinite

under 35 U.S.C. § 112.

304.    Steuben is barred under *res judicata* from arguing that claim 40 of the '188 Patent is

not indefinite under 35 U.S.C. § 112.

305.    Because Steuben is estopped and barred from arguing that claim 40 is not indefinite

under 35 U.S.C. § 112, no reasonable plaintiff in Steuben's position could reasonably expect to

succeed on allegations that NUSA infringes claim 40.

*No basis to allege infringement of any claim of the '188 Patent*

306.    Every extant claim of the '188 Patent requires "aseptically disinfecting."

307.    Plaintiff has taken the position before the USPTO that "aseptically disinfecting"

requires using a sterilant approved by the FDA at the time of filing of Plaintiff's patent applications.

308.    In particular, during the reexamination of the '013 Patent, Plaintiff sought to

distinguish its claimed invention over a reference using chlorinated water to sterilize containers prior

to filling by arguing that "[a]t the time the application that matured into the '013 Patent was filed, the

only FDA approved sterilant for use in low acid packaging was hydrogen peroxide, as such chlorine

could not have been used in [the] aseptic packaging system as claimed by the '013 Patent."

309.    NUSA's accused machines use peroxyacetic acid to sterilize bottles before filling.

310.    At the time of filing of Plaintiff's patent applications, peroxyacetic acid was not

approved by the FDA for aseptically disinfecting bottles for food packaging purposes.

PUBLIC VERSION

311.    Under Plaintiff's own interpretation of "aseptically disinfecting," NUSA cannot infringe any claim of the '188 Patent, because NUSA's sterilant was not FDA-approved at the time of filing of Plaintiff's patent applications.

312.    Furthermore, under Plaintiff's own interpretation of "aseptically disinfecting," claim 40 of the '188 Patent is indefinite, lacks enabling disclosure in the specification, and/or lacks written description in the specification, because the recited "sterilant [that] is peroxyacetic acid and hydrogen peroxide" was not FDA-approved when the application for the '188 Patent was filed. In other words, under Plaintiff's interpretation of "aseptically disinfecting," claim 40 is inherently and irreconcilably indefinite because it both requires that the sterilant be FDA-approved *and* that the sterilant be a particular sterilant that was *not* FDA approved.

*No basis to allege infringement of claims 9, 16, 19, and 21-39 (including asserted claims 19, 21, 22, 24, 26, 28, 30, and 39)*

313.    On information and belief, Plaintiff knew, prior to filing its Complaint, that it had no basis to allege that NUSA infringes claims 9 or 16 of the '188 Patent, at least based on Plaintiff's apparent decision not to assert those claims against GEA.

314.    On information and belief, Plaintiff knows that NUSA's accused machines lack the limitation of an "application of the hot hydrogen peroxide spray for about 1 second and the activation and removal of the hot hydrogen peroxide using hot aseptically sterilized air for about 24 seconds," as is required by claim 9 of the '188 Patent.

315.    On information and belief, Plaintiff knows that NUSA's accused machines lack the limitation of "about 1 second for the application of the hot hydrogen peroxide spray and about 24 seconds for the activation and removal of the hot hydrogen peroxide using hot aseptically sterilized air," as is required by claim 16 of the '188 Patent.

316.    On information and belief, Plaintiff knew, prior to filing its Complaint, that it had no basis to allege that NUSA's accused machines include the means-plus-function limitations of claim 19, at least based on Plaintiff's discovery of information about the accused machines from GEA.

317.    On April 23, 2014, during USPTO reexamination of the '188 Patent, the USPTO examiner issued an office action, which confirmed the patentability of claim 19 on the basis that "the prior art fails to teach or fairly suggest the means for aseptically disinfecting the bottles and the means for filling the bottles at a rate greater than 100 bottles per minute."

318.    In confirming the patentability of claim 19, the USPTO reexamination examiner expressly construed "the means for aseptically disinfecting the bottles" as requiring "two separate structural devices or elements, one which acts to sterilize the outer surfaces of the bottle followed by activation and drying stations, and a 2nd separate one which after outer bottle sterilization sterilizes the interior of the bottles followed by activation and drying stations; a metering device which meters the amount of sterilant applied to each bottle; and a control system which monitors and controls the spray apparatus."

319.    In confirming the patentability of claim 19, the USPTO reexamination examiner expressly construed "the means for filling the bottles at a rate greater than 100 bottles per minute" as requiring "a control system for calculating the desired product volume and controlling the product volume; a single filler apparatus; and a conveyor system which indexes a 2 x 6 matrix of bottles through the various stations at such a speed that over 100 bottles are filled/minute."

320.    On or about June 24, 2013, Plaintiff responded to the USPTO's April 23 office action and requested a reexamination certificate to be issued on the confirmed claims, including claim 19.

PUBLIC VERSION

321.    In its June 24 response to office action, Plaintiff did not contest or dispute the claim construction on which the USPTO reexamination examiner based his confirmation of claim 19 as patentable over the prior art.

322.    At no point during the reexamination of the '013 Patent did Plaintiff contest or dispute the claim construction on which the USPTO reexamination examiner based his confirmation of claim 19 as patentable over the prior art.

323.    Claim 19 requires at least a first structural device or element, which acts to sterilize the outer surfaces of the bottle followed by activation and drying stations.

324.    On information and belief, before filing its Complaint, Plaintiff knew that claim 19 requires at least a structural device or element, which acts to sterilize the outer surfaces of the bottle followed by activation and drying stations. Plaintiff had such knowledge at least from the confirmation of claim 19 during reexamination based specifically on that construction.

325.    NUSA's accused machines literally lack the structural device or element identified in paragraph 323 above.

326.    NUSA's accused machines lack an equivalent of the structural device or element identified in paragraph 323.

327.    On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines literally lack the structural device or element identified in paragraph 323 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

328.    On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines lack an equivalent of the structural device or element identified in paragraph 323.

PUBLIC VERSION

Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

329.    Claim 19 requires at least a second structural device or element (separate from the structural device or element identified above in paragraph 323), which, after outer bottle sterilization, sterilizes the interior of the bottles followed by activation and drying stations.

330.    On information and belief, before filing its Complaint, Plaintiff knew that claim 19 requires at least a second structural device or element (separate from the structural device or element identified above in paragraph 323), which, after outer bottle sterilization, sterilizes the interior of the bottles followed by activation and drying stations. Plaintiff had such knowledge at least from the confirmation of claim 19 during reexamination based specifically on that construction.

331.    NUSA's accused machines literally lack the structural device or element identified in paragraph 329 above.

332.    NUSA's accused machines lack an equivalent of the structural device or element identified in paragraph 329 above.

333.    On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines literally lack the structural device or element identified in paragraph 329 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

334.    On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines lack an equivalent of the structural device or element identified in paragraph 329 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

335.    Claim 19 requires at least a metering device, which meters the amount of sterilant applied to each bottle.

336.    On information and belief, before filing its Complaint, Plaintiff knew that claim 19 requires at least a metering device, which meters the amount of sterilant applied to each bottle. Plaintiff had such knowledge at least from the confirmation of claim 19 during reexamination based specifically on that construction.

337.    NUSA's accused machines literally lack the metering device identified in paragraph 335 above.

338.    NUSA's accused machines lack an equivalent of the metering device identified in paragraph 335 above.

339.    On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines literally lack the metering device identified in paragraph 335 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

340.    On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines lack an equivalent of the metering device identified in paragraph 335 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

341.    Claim 19 requires at least "a control system for calculating the desired product volume and controlling the product volume."

342.    On information and belief, before filing its Complaint, Plaintiff knew that claim 19 requires at least "a control system for calculating the desired product volume and controlling the

product volume." Plaintiff had such knowledge at least from the confirmation of claim 19 during reexamination based specifically on that construction.

343.    NUSA's accused machines literally lack the control system identified in paragraph 341 above.

344.    NUSA's accused machines lack an equivalent of the control system identified in paragraph 341 above.

345.    On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines literally lack the control system identified in paragraph 341 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

346.    On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines lack an equivalent of the control system identified in paragraph 341 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

347.    Claim 19 requires at least "a conveyor system which indexes a 2 x 6 matrix of bottles through the various stations at such a speed that over 100 bottles are filled/minute."

348.    On information and belief, before filing its Complaint, Plaintiff knew that claim 19 requires at least "a conveyor system which indexes a 2 x 6 matrix of bottles through the various stations at such a speed that over 100 bottles are filled/minute." Plaintiff had such knowledge at least from the confirmation of claim 19 during reexamination based specifically on that construction.

349.    NUSA's accused machines literally lack the conveyor system identified in paragraph 347 above.

350.     NUSA's accused machines lack an equivalent of the conveyor system identified in paragraph 347 above.

351.     On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines literally lack the conveyor system identified in paragraph 347 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

352.     On information and belief, before filing its Complaint, Plaintiff knew that NUSA's accused machines lack an equivalent of the conveyor system identified in paragraph 347 above. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

353.     Each of new claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39) of the '188 Patent, as issued in the reexamination certificate, requires a "means for aseptically disinfecting [a] plurality of bottles."

354.     Each of new claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39) of the '188 Patent requires at least the features identified above in paragraphs 323, 329, 335, and 341.

355.     Each of new claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39) of the '188 Patent, as issued in the reexamination certificate, requires a "means for filling the aseptically disinfected plurality of bottles at a rate greater than 100 bottles per minute."

356.     Each of new claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39) of the '188 Patent requires at least the features identified above in paragraph 347.

357.     NUSA's accused machines literally lack at least the "means for aseptically disinfecting [a] plurality of bottles," as recited in each of claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39).

PUBLIC VERSION

358.    NUSA's accused machines lack an equivalent of the "means for aseptically disinfecting [a] plurality of bottles," as recited in each of claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39), under the doctrine of equivalents.

359.    NUSA's accused machines literally lack at least the "means for filling the aseptically disinfected plurality of bottles at a rate greater than 100 bottles per minute," as recited in each of claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39).

360.    NUSA's accused machines lack an equivalent of the "means for filling the aseptically disinfected plurality of bottles at a rate greater than 100 bottles per minute," as recited in each of claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39), under the doctrine of equivalents.

361.    On information and belief, Plaintiff knew, prior to filing its Complaint, that it had no basis to allege that NUSA's accused machines include all of the means-plus-function limitations of each of new claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39), at least based on Plaintiff's discovery of information about the accused machines from GEA.

362.    On information and belief, before filing its Complaint, Plaintiff knew that new claims 21-39 (including asserted claims 21, 22, 24, 26, 28, 30, and 39) of the '188 Patent—each of which recites means-plus-function limitations similar to those recited in claim 19—require one or more elements that NUSA's accused machines lack. Plaintiff had such knowledge at least from the confirmation of claims 21-39 during reexamination and from Plaintiff's discovery of information about the accused machines from GEA.

*No reasonably objective basis for Plaintiff to believe that it would prevail on any claim of the '188 Patent*

363.    Plaintiff continues to assert claims 19, 21, 22, 24, 26, 28, 30, and 39, and 40 of the '188 Patent, which it knows NUSA does not infringe.

364.    Plaintiff continues to assert claims 21, 22, 24, 26, 28, 30, 39, and 40 of the '188 Patent, which it knows cannot be enforced against NUSA due to NUSA's intervening rights.

365.    Plaintiff continues to assert claim 40 of the '188 Patent, which it knows to be invalid, whether based on the prior art, written description, enablement, or indefiniteness.

366.    Because Plaintiff could not prevail against NUSA, and knew that it could not prevail against NUSA, on any claim of the '188 Patent, Plaintiff's assertion of infringement of the '188 Patent is objectively baseless.

### 2.    Sham Assertion of the '013 Patent

367.    Claims 1-20 are the only issued claims of the '013 Patent.

368.    Plaintiff has asserted, and continues to assert, claims 6, 9, 10, and 17-20 against NUSA.

369.    On information and belief, Plaintiff has asserted, and continues to assert, claims 6, 9, 10, and 17-20 in its co-pending infringement suit against GEA.

_No basis to believe that claims 6, 9, 10, and 17-20 are valid_

370.    At the time Plaintiff filed its Complaint against NUSA, Plaintiff knew that claims 6, 9, 10, and 17-20 of the '013 Patent were rejected by the USPTO in _inter partes_ reexamination.

371.    Claims 6, 9, 10, and 17-20 of the '013 Patent are currently rejected in an action closing prosecution and right-of-appeal notice of the reexamination proceedings.

372.    Plaintiff knows that the USPTO PTAB determined in an institution decision for _inter partes_ review that claims 6, 9, 10, and 17-20 of the '013 Patent are reasonably likely unpatentable.

373.    On or about May 14, 2014, Plaintiff proposed to amend claims 18 and 19 of the '013 Patent in _inter partes_ review proceedings in an effort to distinguish those claims over the prior art.

374.    Based at least on the USPTO's rejection of claims 6, 9, 10, and 17-20 during reexamination, the USPTO PTAB initial determinations that claims 6, 9, 10, and 17-20 are reasonably likely unpatentable, and Plaintiff's proposed amendments to claims 18 and 19 in *inter partes* review, no reasonable plaintiff could reasonably expect to succeed on allegations that NUSA infringes claims 6, 9, 10, and 17-20 of the '013 Patent.

*No basis to allege infringement of any claim of the '013 Patent*

375.    Every claim of the '013 Patent requires "aseptically disinfecting."

376.    Plaintiff has taken the position before the USPTO that "aseptically disinfecting" requires using a sterilant approved by the FDA at the time of filing of Plaintiff's patent applications.

377.    In particular, during the reexamination of the '013 Patent, Plaintiff sought to distinguish its claimed invention over a reference using chlorinated water to sterilize containers prior to filling by arguing that "[a]t the time the application that matured into the '013 Patent was filed, the only FDA approved sterilant for use in low acid packaging was hydrogen peroxide, as such chlorine could not have been used in [the] aseptic packaging system as claimed by the '013 Patent."

378.    NUSA's accused machines use peroxyacetic acid to sterilize bottles before filling.

379.    At the time of filing of Plaintiff's patent applications, peroxyacetic acid was not approved by the FDA for aseptically disinfecting bottles for food packaging purposes.

380.    Under Plaintiff's own interpretation of "aseptically disinfecting," NUSA cannot infringe any claim of the '013 Patent, because NUSA's sterilant was not FDA-approved at the time of filing of Plaintiff's patent applications.

*No basis to allege infringement of claims 1-17 (including asserted claims 6, 9, 10, and 17)*

381.    Claims 1-17 (including asserted claims 6, 9, 10, and 17) of the '013 Patent require that the "disinfecting is with hot atomized hydrogen peroxide, wherein said plurality of bottles are in an upright position during disinfecting."

PUBLIC VERSION

382.    NUSA's accused machines lack "disinfecting . . . with hot atomized hydrogen peroxide, wherein said plurality of bottles are in an upright position during disinfecting," as required by claims 1-17, whether literally or under the doctrine of equivalents.

383.    On information and belief, Plaintiff knew prior to filing its Complaint that it had no basis to allege that NUSA infringes any of claims 1-17 (including asserted claims 6, 9, 10, and 17) of the '013 Patent, at least based on Plaintiff's apparent decision not to assert those claims against GEA and based on Plaintiff's discovery of information about NUSA's accused machines from GEA.

_No reasonably objective basis for Plaintiff to believe that it would prevail on any claim of the '013 Patent_

384.    Plaintiff continues to assert claims 6, 9, 10, and 17-20 of the '013 Patent, which it knows to be invalid, unpatentable, and not infringed by NUSA under Plaintiff's own interpretation of those claims.

385.    Because Plaintiff could not prevail against NUSA, and knew that it could not prevail against NUSA, on any claims of the '013 Patent, Plaintiff's assertion of infringement of the '013 Patent is objectively baseless.

### 3.    Sham Assertion of the '468 Patent

_Extant claims: claims 1-13, 15-27, and 32-35_

386.    Claims 1-35 are the only issued claims of the '468 Patent.

387.    At the time Plaintiff filed its Complaint, Plaintiff knew that claims 14 and 28-31 of the '468 Patent were canceled during reexamination proceedings at the USPTO.

388.    Plaintiff has asserted, and continues to assert, claims 3, 9, 20, 21, and 23 against NUSA.

389.    On information and belief, Plaintiff has asserted, and continues to assert, claims 3, 9, 20, 21, and 23 in its co-pending infringement suit against GEA.

*Intervening rights as to claims 11, 12, 23, and 35*

390.    During reexamination of the '468 Patent, Plaintiff materially amended claims 11, 12, 23, and 35 of the '468 Patent.

391.    By its amendments to claims 11, 12, 23, and 35 of the '468 Patent, Plaintiff is estopped from asserting those claims in original, pre-amendment form.

392.    To the extent that amended claims 11, 12, 23 and 35 issue in any reexamination certificate, NUSA has intervening rights as to those claims.

*No basis to believe that claims 1-27 and 32-35 are valid*

393.    At the time Plaintiff filed its Complaint, Plaintiff knew that claims 1, 2, 4-7, 9-13, 16, 17, and 20-27 (including asserted claims 9, 20, 21, and 23) were rejected by the USPTO in *inter partes* reexamination.

394.    Claims 1, 2, 4-7, 9-13, 16, 17, and 20-27 (including asserted claims 9, 20, 21, and 23) are currently rejected in an action closing prosecution and right-of-appeal notice of the reexamination proceedings, and Plaintiff has not appealed the rejection of claims 1, 2, 4-7, 10-13, 21, 22, and 23-27 (including asserted claims 21 and 23).

395.    Plaintiff knows that the USPTO PTAB determined in an institution decision for *inter partes* review that claims 1-27 and 32-35 (including asserted claims 3, 9, 20, 21, and 23) of the '468 Patent are reasonably likely unpatentable.

396.    Based at least on the USPTO's rejection of at least claims 1, 2, 4-7, 9-13, 16, 17, and 20-27 in reexamination, and the USPTO PTAB's determination that at least claims 1-27 and 32-35 are reasonably likely unpatentable, no reasonable plaintiff could reasonably expect to succeed on allegations that NUSA infringes, *inter alia*, claims 1-3, 9, or 20-23 (including asserted claims 3, 9, 20, 21, and 23) of the '468 Patent.

*No basis to allege infringement of any claims*

397.    On information and belief, Plaintiff knew prior to filing its Complaint that it had no basis to allege that NUSA infringes any of claims 4-8, 10-19, and 24-35 of the '468 Patent, at least based on Plaintiff's apparent decision not to assert those claims against GEA.

398.    Claims 1-3, 9, and 20-23 (including asserted claims 3, 9, 20, 21, and 23) all require "surrounding a region where the aseptic product exits the valve with a sterile region wherein the sterile region is a sterile tunnel."

399.    On information and belief, Plaintiff knows that it has no basis to allege that NUSA's accused machines include "surrounding a region where the aseptic product exits the valve with a sterile region wherein the sterile region is a sterile tunnel," as required by claims 1-3, 9, and 20-23. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

400.    Claims 1-3, 9, and 20-23 all require "wherein the sealed actuator is surrounded with the sterile region."

401.    On information and belief, Plaintiff knows that it has no basis to allege that NUSA's accused machine includes "wherein the sealed actuator is surrounded with the sterile region," as required by claims 1-3, 9, and 20-23. Plaintiff had such knowledge at least based on Plaintiff's discovery of information about the accused machines from GEA.

*No reasonably objective basis for Plaintiff to believe that it would prevail on any claim of the '468 Patent*

402.    Plaintiff continues to assert claims 3, 9, 20, 21, and 23 of the '468 Patent against NUSA, which it knows to be invalid and unpatentable, and which Plaintiff knows cannot be infringed by NUSA.

403.     On information and belief, Plaintiff continues to assert at least claims 3, 9, 20, 21, and 23 of the '468 Patent against GEA, which claims it knows to be invalid and unpatentable, and which Plaintiff knows cannot be infringed by GEA.

404.     Because Plaintiff could not prevail against NUSA, and knew that it could not prevail against NUSA, on any claims of the '468 Patent, Plaintiff's assertion of infringement of the '468 Patent is objectively baseless.

### 4.     Sham Assertion of the '435 Patent

405.     Claims 1-37 are the only issued claims of the '435 Patent.

406.     Plaintiff has asserted, and continues to assert, claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, and 37 against NUSA.

407.     On information and belief, Plaintiff has asserted, and continues to assert, claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, and 37 against GEA in its co-pending infringement suit against GEA.

_Intervening rights as to claims 22, 25, 27, and 29_

408.     During reexamination of the '435 Patent, Plaintiff materially amended claims 22, 25, 27, and 29 of the '435 Patent.

409.     By its amendments to claims 22, 25, 27, and 29 of the '435 Patent, Plaintiff is estopped from asserting those claims in original, pre-amendment form.

410.     To the extent that amended claims 22, 25, 27, and 29 issue in any reexamination certificate, NUSA has intervening rights as to those claims.

_No basis to believe that claims 1-37 are valid_

411.     Plaintiff knows that claims 1-37 are rejected by the USPTO in _ex parte_ reexamination, and Plaintiff knew that fact at least by the time Plaintiff served its infringement contentions on NUSA on September 15, 2015, September 24, 2015, October 9, 2015, and November 6, 2015.

PUBLIC VERSION

412.     Plaintiff knows that the USPTO PTAB determined in one or more institution decisions for inter partes review that claims 1-37 (including asserted claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, and 37) of the '435 Patent are reasonably likely unpatentable, and Plaintiff knew that fact at least by the time Plaintiff served its infringement contentions on NUSA on September 15, 2015, September 24, 2015, October 9, 2015, and November 6, 2015.

413.     Based at least on the USPTO PTAB's determination that claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, and 37 are reasonably likely unpatentable, no reasonable plaintiff could reasonably expect to succeed on allegations that NUSA infringes claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, and 37 of the '435 Patent.

_No basis to allege infringement of any claims_

414.     On information and belief, Plaintiff knew, prior to filing its Complaint, that it had no basis to allege that NUSA infringes any of claims 11-13, 15, 22-24, 26, 28, 30-32, or 37 of the '435 Patent, at least based on Plaintiff's apparent decision not to assert those claims (at least initially) against GEA.

415.     Claims 1-37 (including asserted claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, and 37) all require "a ratio of at least about 5 to 1" between the sterilant concentrations of various sterile zones.

416.     On information and belief, Plaintiff's asserted basis for alleging that NUSA's accused machines satisfy the "ratio of at least about 5 to 1" recited in claims 1-37 (including asserted claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, and 37), is that the ratio of concentration of sterilant applied to the bottles to the concentration of sterilant remaining in filled and capped bottles is "at least about 5 to 1." Under that apparent interpretation of the claims, _every_ prior-art sterilization tunnel using a chemical sterilant would necessarily meet the claimed ratio, and the claims are invalid over the prior art. Thus, Plaintiff has no basis to assert that the claims are _both_ infringed _and_ valid.

**PUBLIC VERSION**

*No reasonably objective basis for Plaintiff to believe that it would prevail on any claim of the '435 Patent*

417.    Plaintiff continues to assert claims 1, 3, 4, 8-10, 14, 16, 17, 32, 33, and 37, which it knows to be invalid and unpatentable, and which Plaintiff knows cannot be infringed by NUSA.

418.    Because Plaintiff could not prevail against NUSA, and knew that it could not prevail against NUSA, on any claims of the '435 Patent, Plaintiff's assertion of infringement of the '468 Patent is objectively baseless.

### 5.    Sham Assertion of the '591 Patent

*Extant claims: claims 1-22 and 24-28*

419.    An *ex parte* reexamination certificate for the '591 Patent issued on November 25, 2013. In the *ex parte* reexamination certificate, claim 23 was canceled, and remaining independent claims 1, 3, 16, 22, 24, and 26 were materially amended. Thus, claims 1-22 and 24-28 are the only currently issued claims of the '591 Patent.

420.    Plaintiff has asserted, and continues to assert, claims 1, 2, 17, 26 of the '591 Patent against NUSA.

421.    On information and belief, Plaintiff has asserted, and continues to assert, claims 1, 2, 17, 26 of the '591 Patent in its co-pending infringement suit against GEA.

*Intervening rights as to all extant claims*

422.    At the time Plaintiff filed its Complaint against NUSA, Plaintiff knew that NUSA would obtain intervening rights in the amended claims of the '591 Patent.

423.    Plaintiff asserted in its Complaint that the '591 Patent was "valid and subsisting." Three days after filing its Complaint, Plaintiff canceled claim 23 and materially amended all remaining independent claims (i.e., claims 1, 3, 16, 22, 24, and 26) of the '591 Patent in reexamination. The amendments to all remaining independent claims also materially amended every

PUBLIC VERSION

dependent claim of the '591 Patent by virtue of their dependence. Plaintiff, at the time it filed its

Complaint, knew that the claims would be amended and were, therefore, neither "valid" nor

"subsisting," as asserted in Plaintiff's Complaint.

424.    Plaintiff knows that NUSA has intervening rights in all claims of the '591 Patent.

*No basis to believe claims 1-22 and 24-28 are valid*

425.    Plaintiff knows that the USPTO PTAB determined in an institution decision for *inter*

*partes* review that claims 1-22 and 24-28 of the '591 Patent are reasonably likely unpatentable.

426.    Based at least on the USPTO PTAB's determination that claims 1-22 and 24-28 are

reasonably likely unpatentable, no reasonable plaintiff could reasonable expect to succeed on

allegations that NUSA infringes claims 1-22 and 24-28.

*No basis to allege infringement of any claims*

427.    On information and belief, Plaintiff knew, prior to filing its Complaint, that it had no

basis to allege that NUSA infringes claims 3-15, 19-25, 27, or 28 of the '591 Patent, based at least on

Plaintiff's apparent decision not to assert those claims against GEA.

428.    Claims 1, 2, 16-18, and 26 (including asserted claims 1, 2, 17, and 26) all require

extending and retracting a portion of a valve between a first sterile region and a second sterile region.

429.    NUSA's accused machines do not extend and retract a portion of a valve between a

first sterile region and a second sterile region, as recited in claims 1, 2, 16-18, and 26 (including

asserted claims 1, 2, 17, and 26).

430.    On information and belief, Plaintiff knows that it has no basis to allege that NUSA's

accused machines include extending and retracting a portion of a valve between a first sterile region

and a second sterile region, as required by claims 1, 2, 16-18, and 26 (including asserted claims 1, 2,

17, and 26). Plaintiff had such knowledge at least based on Plaintiff's discovery of information about

the accused machines from GEA

PUBLIC VERSION

*No reasonably objective basis for Plaintiff to believe that it would prevail on any claim of the '591 Patent*

431.    Plaintiff continues to assert claims 1, 2, 17, and 26 of the '591 Patent, which it knows to be invalid and unpatentable, and unenforceable against NUSA based on NUSA's intervening rights.

432.    On information and belief, Plaintiff continues to assert claims 1, 2, 17, and 26 of the '591 Patent against GEA.

433.    Because Plaintiff could not prevail against NUSA, and knew that it could not prevail against NUSA, on any claims of the '591 Patent, Plaintiff's assertion of infringement of the '591 Patent is objectively baseless.

**D.    Plaintiff's Specific Intent**

434.    On information and belief, Plaintiff's sham litigation, as alleged above, has been conducted with the specific intention to interfere directly with the business position and business relationships of NUSA, Nestlé Healthcare, and of NUSA's suppliers (including GEA).

435.    As part of Plaintiff's unlawful scheme in asserting the Patents in Suit against NUSA, Plaintiff knew, on information and belief, that asserting the Patents in Suit would intimidate potential sellers of bottling machines and aseptic bottling services and discourage them from selling such products and services to NUSA, and would intimidate potential aseptic bottlers (including NUSA) and discourage them from contracting with Nestlé Healthcare to produce aseptically bottled products for Nestlé Healthcare.

**E.    Injury Caused by Plaintiff's Anticompetitive and/or Exclusionary Conduct**

436.    As a result of Plaintiff's unlawful actions, NUSA has been unable to purchase bottling machines from suppliers, except under unfavorable terms.

437.    NUSA has been forced to incur substantial attorneys' fees and costs to defend itself against Plaintiff's unlawful actions.

438.    Plaintiff continues to use the chilling effect of its unlawful and baseless patent infringement suits of known invalid and unenforceable claims to require Nestlé Healthcare to purchase aseptic packaging services from Plaintiff. The products that Nestlé Healthcare requires aseptic packaging services to create are non-patented products. Due to Plaintiff's chilling effect through baseless litigation of claims in which NUSA has intervening rights and which Plaintiff knows to be invalid and unpatentable, Plaintiff unlawfully attempts to monopolize the non-patented articles and services.

439.    The foregoing acts by Plaintiff, and the continuing course of Plaintiff's anti-competitive and/or exclusionary conduct, have harmed and continue to harm NUSA, Nestlé Healthcare, and competition in the marketplace, as evidenced, e.g., by a November 2011 presentation at the annual ASEPTIPAK forum, titled *Legal Status and Commercial Impact of the Steuben Litigation*, and by a January 2012 article in Packaging World magazine, titled *Will 'Steuben patents' dampen growth of aseptics in bottles?*.

440.    On information and belief, Plaintiff undertook its anti-competitive and/or exclusionary acts in an attempt to monopolize to relevant market.

441.    Plaintiff's conduct has occurred in, and is having a substantial effect on, interstate commerce.

442.    As a direct and proximate cause of Plaintiff's anti-competitive conduct, NUSA has been injured and has sustained damages. For example, Plaintiff's conduct has forced Nestlé Healthcare to purchase (and continue to purchase) aseptic-bottling services from Plaintiff (which NUSA would otherwise be able to provide without Plaintiff's involvement, or which Nestlé Healthcare would otherwise be able to purchase from other co-packers). Additionally, Plaintiff's conduct has caused damage to NUSA in the form of lost business, lost sales, and lost profits. NUSA will continue to

PUBLIC VERSION

sustain damages in the future. Unless the activities complained of are enjoined, NUSA will suffer immediate and irreparable injury for which NUSA has no adequate remedy at law.

443.    The extent of NUSA's specific damages resulting from Plaintiff's unlawful actions, including NUSA's attorneys' fees and costs in defending the litigation, is non-speculative, and may be ascertained via discovery and/or through the application of accepted damages principles.

444.    As a direct competitor that was targeted by Plaintiff's anticompetitive conduct, NUSA has standing to bring this claim.

445.    NUSA is entitled to recover damages under Section 2 of the Sherman Act, 15 U.S.C. § 2, including its attorneys' fees and costs. NUSA is also entitled to a permanent injunction restraining Plaintiff from engaging in anticompetitive acts.

## COUNT TWELVE
### (Tortious Interference with Prospective Business Relationships and/or Prospective Economic Advantage)

446.    NUSA repeats the allegations of paragraphs 1 through 445 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

447.    NUSA has existing and prospective relationships with suppliers of aseptic bottling machines, including GEA, and NUSA has a reasonable expectation that such suppliers will be willing and able to supply aseptic bottling machines to NUSA.

448.    NUSA has and had a prospective economic advantage, namely the ability to aseptically bottle foodstuffs using bottling lines purchased from GEA.

449.    On information and belief, Plaintiff has intentionally and unlawfully interfered with NUSA's existing and prospective relationships and NUSA's prospective economic advantage by wrongful means, namely sham patent infringement litigation and the assertion of patents to cover all commercially feasible FDA-compliant aseptic bottling processes, including through Plaintiff's continued litigation against GEA. Plaintiff's sham patent infringement litigations also have disrupted

PUBLIC VERSION

NUSA's ability to contract for new aseptic bottling machines and aseptic foodstuff production, for both existing and future contracts. To the extent NUSA has been able to obtain aseptic bottling machines from GEA, it has done so only under unfavorable terms.

450.    Plaintiff's intentional and unlawful interference with NUSA's existing and prospective relationships with suppliers, including GEA, has been conducted in bad faith, and without a bona fide business purpose, to secure a competitive advantage over NUSA. For example, on information and belief, Plaintiff's interference has been conducted in an effort to force Nestlé Healthcare to purchase aseptic-bottling services from Plaintiff, which NUSA would otherwise perform without Plaintiff's involvement or which Nestlé Healthcare would otherwise purchase from other aseptic-bottling service providers.

451.    Plaintiff's disruption of NUSA's contractual relationships and prospective relationships has caused damage to NUSA in the form of lost business, lost sales, and lost profits.

452.    Plaintiff's interference has caused an unlawful restraint of trade.

453.    Unless the activities by Plaintiff complained of are enjoined, NUSA will suffer immediate and irreparable injury for which NUSA has no adequate remedy at law.

## COUNT THIRTEEN
### (Declaratory Judgment—Unenforceability of the Patents in Suit)

454.    NUSA repeats and incorporates by reference paragraphs 1 through 453 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

455.    Plaintiff has accused NUSA of infringing the Patents in Suit.

456.    Plaintiff has created an actual and justiciable controversy between itself and NUSA regarding whether NUSA has infringed any valid and enforceable claim of the Patents in Suit.

457.    The Patents in Suit are unenforceable due to inequitable conduct at the USPTO.

458.    A judicial declaration that the Patents in Suit are unenforceable is necessary and appropriate to resolve this controversy.

## COUNT FOURTEEN
### (Walker Process Fraud, Attempted Monopolization under 15 U.S.C. § 2)

459.    NUSA repeats and incorporates paragraphs 1 through 458 of this Answer, Affirmative Defense, and Counterclaims as if fully set forth herein.

460.    As set forth, e.g., in paragraphs 91-194 above, during prosecution of the Patents in Suit, one or more individuals associated with the prosecution of the Patents in Suit, including but not limited to Steuben, Mr. Taggart, and their counsel prosecuting the applications for the Patents in Suit failed to cite material prior art information, publications and other material showing, among other things, the availability of invalidating technology more than one year prior to the priority date of the Patents in Suit and information obtained from others that was claimed in the Patents in Suit. Steuben, Mr. Taggart, and their counsel withheld this prior art information, publications, and other material from the USPTO with deceptive intent. To the extent that Steuben, Mr. Taggart, and their counsel did provide some information regarding this material prior art, they did so in deceptive fashion intended to conceal the critical elements of the information.

461.    On information and belief, the USPTO justifiably relied on the conduct of Steuben, Mr. Taggart, and the individuals associated with the prosecution of the Patents in Suit, and if Steuben, Mr. Taggart, and the individuals associated with the prosecution of the Patents in Suit had not withheld critical prior art information and had not misrepresented the information they did present to the USPTO, the USPTO would not have issued the Patents in Suit.

462.    As a result, Steuben obtained the Patents in Suit by knowingly and willfully misrepresenting facts to the USPTO.

PUBLIC VERSION

463.    Steuben's fraud on the USPTO, and the public, is a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Through this fraud, Steuben engaged in predatory or uncompetitive conduct with a specific intent to monopolize.

464.    Through its illegal conduct, Steuben has attempted to monopolize the market for aseptically bottling low-acid food products in compliance with United States FDA's regulations governing low-acid aseptic food packaging processes. More specifically, Steuben has attempted to monopolize the relevant market by asserting one or more of its fraudulently procured patents to cover all commercially feasible FDA-compliant methods of aseptically bottling food products and all commercially feasible FDA-compliant aseptic bottling machines, and by seeking to enjoin the use and sale of such aseptic bottling machines. With respect to the allegation in this counterclaim, the relevant geographic market is the United States.

465.    There is a dangerous probability that Steuben will achieve monopoly power in the market for aseptically bottling services for low-acid food products in compliance with United States FDA's regulations governing low-acid aseptic food packaging processes, at least because Steuben asserts the Patents in Suit in manner that would cover all commercially feasible FDA-compliant aseptic bottling methods in the United States.

466.    As a result of Steuben's unlawful acts, NUSA has suffered and will continue to suffer antitrust injury in an amount to be proven at trial. Steuben's attempted enforcement of the Patents in Suit and Steuben's anti-competitive conduct have produced significant injury to NUSA. First, they have forced NUSA to expend substantial amounts of money, time and human resources to defend the action. Second, NUSA has been unable to purchase bottling machines except under unfavorable terms. Third, NUSA has been unable to meet Nestlé HealthCare's demand for its Boost product,

PUBLIC VERSION

forcing Nestlé HeathCare to continue to purchase aseptic bottling services for its Boost product from

Steuben.

**PRAYER FOR RELIEF**

WHEREFORE, NUSA requests entry of a judgment:

A.    Dismissing the Complaint with prejudice;

B.    Declaring that the claims of the '013 Patent are invalid;

C.    Declaring that the claims of the '013 Patent are not infringed by NUSA;

D.    Declaring that the claims of the '188 Patent are invalid;

E.    Declaring that the claims of the '188 Patent are not infringed by NUSA;

F.    Declaring that the claims of the '468 Patent are invalid;

G.    Declaring that the claims of the '468 Patent are not infringed by NUSA;

H.    Declaring that the claims of the '435 Patent are invalid;

I.    Declaring that the claims of the '435 Patent are not infringed by NUSA;

J.    Declaring that the claims of the '591 Patent are invalid;

K.    Declaring that the claims of the '591 Patent are not infringed by NUSA;

L.    Declaring that the claims of the Patents in Suit are unenforceable due to

inequitable conduct at the USPTO;

M.    Enjoining Steuben, its agents, employees, and attorneys, and all persons in active

concert or participation with any of them who receive actual notice of the order by personal

service or otherwise from directly or indirectly charging infringement, or instituting any further

action for infringement of the Patents in Suit based on NUSA's accused systems and methods,

against NUSA's and/or any of its affiliates, suppliers, customers, licensees, potential customers

or licensees;

N.    Declaring that Steuben has violated the Sherman Act, 15 U.S.C. § 2;

PUBLIC VERSION

O.      Granting an award of damages for Steuben's anticompetitive conduct;

P.      Granting an award of treble damages under federal antitrust laws;

Q.      Granting an award of punitive damages against Steuben for its unlawful and anticompetitive conduct, which was and is intended to harm NUSA in the conduct of its business;

R.      Declaring that Steuben has tortiously interfered with NUSA's prospective business relationships and prospective business advantages;

S.      Granting an award of damages for Steuben's tortious interference with NUSA's prospective business relationships and prospective business advantages;

T.      Entering a permanent injunction prohibiting further actions or threatened actions against NUSA or its customers or suppliers for infringement of any of the '013 Patent, the '188 Patent, the '468 Patent, the '435 Patent, or the '591 Patent;

U.      Declaring this case an exceptional one pursuant to 35 U.S.C. § 285;

V.      Awarding NUSA its costs and reasonable attorney's fees incurred in this action; and

W.      Awarding any other and further relief that this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

NUSA requests a trial by jury for all issues that may be properly tried by a jury in this action.

**PUBLIC VERSION**

Dated: April 13, 2016                    Respectfully submitted,

                                by:    /s/ *Thomas H. Jenkins*
                                       FINNEGAN HENDERSON FARABOW
                                       GARRETT & DUNNER LLP
                                       Virginia L. Carron, Esq.
                                       3500 Sun Trust Plaza
                                       303 Peachtree Street
                                       Atlanta, GA 30308
                                       Telephone: (404) 653-6400
                                       virginia.carron@finnegan.com

                                       Thomas Jenkins, Esq.
                                       Tyler Akagi, Esq.
                                       901 New York Avenue NW
                                       Washington, DC 20002
                                       Telephone: (202) 408-4000
                                       tom.jenkins@finnegan.com
                                       tyler.akagi@finnegan.com

                                       GOLDBERG SEGALLA LLP
                                       Daniel Barrie Moar, Esq.
                                       665 Main Street, Suite 400
                                       Buffalo, NY 14203
                                       Telephone: (716) 844-3416
                                       dmoar@goldbergsegalla.com

                                       GEIGER AND ROTHENBERG, LLP
                                       David Rothenberg, Esq.
                                       45 Exchange Street, Suite 800
                                       Rochester, NY 14614
                                       Telephone: (585) 323-1946
                                       drothenberg@geigroth.com

                                       *Attorneys for Defendant*
                                       *Nestlé USA, Inc.*

PUBLIC VERSION

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**STEUBEN FOODS, INC.,**                          Case No. 1:13-cv-00892-EAW-JJM

                    *Plaintiff*,

          v.

**NESTLÉ USA, INC.,**

                    *Defendant*.

---

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2016, I electronically filed Defendant's Notice of

Motion to Amend the Pleadings and accompanying Memorandum in Support with the Clerk

of the District Court using the CM/ECF system, which sent notice to the following:

1. Joseph L. Stanganelli: jstanganelli@hblaw.com, docketing@hblaw.com, ktimberlake@hblaw.com, mpeterman@hblaw.com

2. Mark Eric Galvez: mgalvez@hblaw.com

3. Thomas J. Fisher: tfisher@oblon.com, kpettipas@oblon.com

                              */s/ Thomas H. Jenkins*